# United States Court of Appeals
## For the First Circuit

No. 23-1922

CLEMENTE PROPERTIES, INC.; 21 IN RIGHT, INC.; ROBERTO CLEMENTE, JR.; LUIS ROBERTO CLEMENTE; ROBERTO ENRIQUE CLEMENTE,

Plaintiffs, Appellants,

v.

HON. PEDRO R. PIERLUISI-URRUTIA, Governor of Puerto Rico, in his official and individual capacity and as representative of the Commonwealth of Puerto Rico; EILEEN M. VÉLEZ-VEGA, Secretary of the Department of Transportation and Public Works, in her official and individual capacity; FRANCISCO PARÉS ALICEA, Secretary of the Department of the Treasury, in his official and individual capacity; RAY J. QUINOÑES-VÁZQUEZ, Secretary of the Department of Sports and Recreation, in his official and individual capacity; PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY,

Defendants, Appellees,

JOHN DOE; CONJUGAL PARTNERSHIP DOE-VÉLEZ; JANE DOE; CONJUGAL PARTNERSHIP QUIÑONES-DOE,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gina R. Méndez-Miró, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

---

Tanaira Padilla-Rodriguez and Wencong Fa, with whom Beacon Center of Tennessee was on brief, for appellants.

Mariola Abreu-Acevedo, Assistant Solicitor General, with whom Fernando Figueroa-Santiago, Solicitor General of Puerto Rico, and Omar Andino-Figueroa, Deputy Solicitor General, were on brief, for appellees.

January 16, 2026

THOMPSON, _Circuit Judge_.  The sons of a famous Puerto Rico baseball player, Roberto Clemente ("Clemente"), together with two corporations under their control, have sued the Commonwealth of Puerto Rico (the "Commonwealth") and several related defendants over the use of Clemente's name and image on commemorative license plates and registration tags.  The proceeds from those commemorative items were set aside to fund a "sports district" that will bear Clemente's name but will replace a similar initiative originally conceived by Clemente and his wife.  Clemente's sons call themselves the "ultimate representatives and protectors of his legacy."  The problem is that the laws they invoke in this case -- the Lanham Act and the Constitution's Takings Clause -- are designed not to protect legacies but instead to remedy unfair competition, consumer confusion, and the taking of property for public use without just compensation.  Moreover, because the opposing parties include the Commonwealth and its officials, Clemente's heirs, in their quest to vindicate their father's name, face an obstacle course of doctrinal immunities designed to protect governments and officials from lawsuits.

The district court ruled that the Clementes struck out on all claims and against all defendants when it granted two motions to dismiss.  The Clementes, now appellants, want us to overturn several calls from the game below.  After a careful review, we think the district court's grounds for dismissal of

- 3 -

some of the claims against Commonwealth officials were off base. We thus vacate dismissal of appellants' claims under certain provisions of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a)(1)(A) and 1125(c), against the individual officials in their personal capacities, and remand for further proceedings, but otherwise affirm dismissal of their claims.

## THE PRE-GAME REPORT (HOW WE GOT HERE)

### Roberto Clemente's Legacy

Because this case arises from the grant of a Rule 12(b)(6) motion, we present the facts as alleged in the operative complaint. Aresty Int'l L. Firm, P.C. v. Citibank, N.A., 677 F.3d 54, 56 (1st Cir. 2012). Clemente, nicknamed "The Great One" by his fans, was (as we've just said) a famous Puerto Rico baseball player who played for the Pittsburgh Pirates wearing jersey number 21. Over the course of his successful career, he accumulated 3,000 regular-season hits, a feat achieved by only 33 players in the history of Major League Baseball. In addition to being an athlete, Clemente was also a champion of humanitarian causes. He died in a plane crash in 1972 while en route to Nicaragua to deliver aid to earthquake victims. Since his death, his widow (who passed in 2020) and his three sons (Roberto Clemente Junior, Luis Roberto Clemente, and Roberto Enrique Clemente) have tried to protect his legacy and support the causes that Clemente believed in.

Appellants in the present litigation comprise Clemente's sons and two corporations they control: Clemente Properties, Inc. and 21 In Right, Inc. Clemente Properties registered the trademark "Roberto Clemente" with the United States Patent and Trademark Office ("USPTO," for short). See ROBERTO CLEMENTE, Registration No. 5,176,650. And 21 In Right, according to the complaint, "is the corporation with the right to license the Roberto Clemente trademark." 21 In Right licenses the mark for use by "select companies for high quality merchandise and endorsements" and appellants (through management agency CMG Worldwide Inc.) police any unauthorized uses.

The Clemente family has allowed various organizations to operate under the name "Roberto Clemente," including the Roberto Clemente Foundation. Particularly relevant to this litigation is Ciudad Deportiva Roberto Clemente Inc. ("Ciudad Deportiva"). Ciudad Deportiva operates a youth sports facility (of the same name) on land donated by the Commonwealth. It appears that, at the time of the key events leading to this lawsuit, Ciudad Deportiva was in such need of repair and further development that it could not be opened to the public. The complaint blames problems with the maintenance of Ciudad Deportiva on the cessation of government funding and on "the public officials that sit in Cuidad [sic] Deportiva's board of directors" who blocked a "work plan to achieve the reopening of the facilities with private

- 5 -

investment."  We note that we cannot tell from the face of the complaint what involvement appellants have, if any, in Ciudad Deportiva, and Ciudad Deportiva is not a party to this litigation. The complaint emphasizes only that Clemente founded Ciudad Deportiva and that Ciudad Deportiva "is one of the most valuable and recognizable endeavors backed by the Roberto Clemente mark."

**The Alleged Unauthorized Use**

The events leading to the present dispute occurred in 2021 and 2022.  Sometime before the events we're about to recount (the complaint doesn't specify when), appellants authorized Ciudad Deportiva "to use the trademark, name and likeness of Roberto Clemente" on vehicle license plates.  Ciudad Deportiva planned to raise funds by issuing commemorative license plates to members of the public for a voluntary donation of $2.10.  In February 2021, a letter (the complaint doesn't say from whom) informed Puerto Rico Governor Pedro R. Pierluisi-Urrutia ("Governor Pierluisi") of this plan.

As early as March 2021, two pieces of legislation were proposed in the Puerto Rico Legislature, which were eventually enacted as Joint Resolutions Nos. 16 and 17 on August 5, 2021.  In final form, Joint Resolution No. 16 required any driver who acquired a new Puerto Rico license plate in calendar year 2022 to purchase a special plate commemorating the 50th anniversary of Roberto Clemente's 3,000th hit.  Drivers were charged an additional

$21 (apparently over and above the usual fees) for this plate. Any member of the public who did not need to acquire a new license plate could also pay $21 to exchange their existing license plate for the Roberto Clemente commemorative plate. According to the complaint, Secretary of Transportation and Public Works Eileen M. Vélez-Vega ("Secretary Vélez" or "Transportation Secretary") promoted Joint Resolution No. 16 and particularly advocated for making the purchase of the commemorative plate mandatory for any individual who acquired a new plate in 2022. Joint Resolution 17 added a mandatory $5 surcharge to registration tags issued in calendar year 2022 in return for a tag that commemorated the same 50-year anniversary of Clemente's 3,000th hit. The commemorative plate and tag included the following visual elements: an image of Roberto Clemente; the words "Clemente," "anniversary," and "3000 hits"; and the numbers "21" and "50." The money collected from Joint Resolutions Nos. 16 and 17 was to be placed in something called "the Roberto Clemente Sports District Fund." The Joint Resolutions stated that the Roberto Clemente Sports District Fund would be administered by the Department of the Treasury for the exclusive use of the Department of Sports and Recreation.[1] When

---

[1] Throughout this opinion, we rely on the complaint's allegations for the substance of the challenged legislation. Appellants' addendum includes certified translations of Joint Resolutions Nos. 16 and 17, as well as Law 67-2022 (which we'll introduce in a moment). But because it appears that such

paying for registration tags, drivers were also presented the opportunity to make a donation to the Roberto Clemente Sports District Fund.

The day before Governor Pierluisi signed Joint Resolutions Nos. 16 and 17 into law, the Governor's office notified one of Roberto Clemente's sons, Luis Roberto, of the pending legislation. In response, Luis Roberto emailed the Governor's Assistant Chief of Staff to inform him that "the name Roberto Clemente and its image was a registered trademark and its use required prior authorization" and that the Clemente family had not been asked "for approval" of the Commonwealth's planned use. Luis Roberto also attached the February 2021 letter regarding the planned license plates to be issued by Ciudad Deportiva. The Governor nonetheless signed the two Joint Resolutions into law.

Puerto Rico's citizenry reacted negatively to the new commemorative license plates and registration tags, and the public believed that appellants were receiving some financial benefit for the charges associated with the commemorative items. The complaint claims that this confusion was exacerbated by a couple of additional statements. First, the Transportation Secretary made a televised statement, in January 2022, that the funds collected

translations were not provided to the district court and thus were not part of the record below, we do not consider the translations here. See United States v. Guadalupe-Rivera, 501 F.3d 17, 21 n.4 (1st Cir. 2007).

for commemorative plates and tags would go to "the Roberto Clemente Foundation." She also "responded in the affirmative when inquired if the charge to restauration [sic] of Ciudad Deportiva Roberto Clemente was mandatory." In addition, "the document of permit for motor vehicles" (a license issued by the Department of Transportation and Public Works) lists the $5 surcharge for vehicle registration tags next to the words "Roberto Clemente Fund." To combat this confusion, Luis Roberto communicated with the public and with the Commonwealth's government about "the ownership of the trademark, the misappropriation and the unauthorized use."

A few months later, the Commonwealth enacted Law 67-2022. As described in the complaint, Law 67-2022 transferred Ciudad Deportiva's land back to the Commonwealth for the purpose of building the "Roberto Clemente Sports District" (the "Sports District"). The Sports District was envisioned "as a sports and recreational facility for the enjoyment of Puerto Ricans and sports tourism." The law delegated the responsibility for development of the Sports District among several entities. For instance, the Department of Sports and Recreation was given authority over leasing, sub-leasing, and using the Roberto Clemente Sports District Fund (or just the "Fund") "for everything related to the operation, administration and conservation of the Roberto Clemente Sports District." The Puerto Rico Convention District Authority (the "Authority") was put in charge of "planning

and organization," including "the development, reconstruction and construction of facilities for its proper functioning." The law further provided that the Authority would be able to enter into agreements "as it deems necessary to induce third parties to develop" the Sports District. To carry out these responsibilities, the Authority would be allocated $150,000 from the Fund annually. Appellants allege that Law 67-2022 communicates "some kind of tacit endorsement of Roberto Clemente to this project" by expressly referring to "his vision of building a Sports City for the benefit of our young people and future generations." In appellants' view, the Commonwealth is using Clemente's name and image "to destroy his dream and his creation: Ciudad Deportiva," and to replace it with an "imitation."

**District Court Proceedings**

Seeking relief, appellants sued the Commonwealth of Puerto Rico, Governor Pierluisi, Transportation Secretary Vélez, and the Authority in federal district court. They also named as defendants Secretary of the Treasury Francisco Parés-Alicea (presumably based on the Department of the Treasury's administration of the Roberto Clemente Sports District Fund), and Secretary of the Department of Sports and Recreation Ray J. Quinoñes-Vázquez (whom allegedly endorsed Law 67-2022, was a member of the Ciudad Deportiva Board of Directors, and was

"directly responsible for the creation of the Roberto Clemente Sports District").

Appellants asserted several causes of action under the Lanham Act; more specifically, they contended that appellees' use of Roberto Clemente's name and image in connection with the license plates, registration tags, and Sports District amounted to trademark infringement, false association, false advertising, and trademark dilution. See 15 U.S.C. §§ 1114(1), 1125(a)(1)(A), 1125(a)(1)(B), and 1125(c). Appellants also asserted that the appellees' use of the "Roberto Clemente trademark and likeness" constitutes a taking without just compensation in violation of the Fifth and Fourteenth Amendments.[2]

Two motions to dismiss were filed below: one by the Commonwealth and its officials (the "Commonwealth Defendants") and one by the Authority. Both argued under Rule 12(b)(6) that the complaint failed to state a claim upon which relief could be granted for a variety of reasons. In relevant part, the Commonwealth Defendants' motion invoked sovereign immunity and qualified immunity defenses and challenged the Lanham Act claims on the merits of whether "commercial advertising" was sufficiently

_____

[2] Appellants, in their own words, also asserted counts for a Section 1983 cause of action, a due process claim, claims under Puerto Rico's trademark and right of publicity statutes, and a claim for "unconstitutionality of statutes" under the federal and Puerto Rico constitutions. None of these counts are at issue on appeal.

alleged. The Authority's motion argued that it was only minimally involved in the allegedly wrongful conduct -- that is, the complaint only alleged that the Authority had certain statutory obligations under Law 67-2022 but not that the Authority performed any tasks that would constitute a taking or a Lanham Act violation.

The district court granted both motions to dismiss for a number of overlapping reasons, which we'll discuss in detail as they become relevant to our analysis. For now, it is enough to say the district court grounded dismissal of the federal claims in sovereign immunity, qualified immunity, and the failure to state a plausible claim on the merits -- and then declined to exercise subject matter jurisdiction over the non-federal claims. See Clemente Props., Inc. v. Pierluisi-Urrutia, 693 F. Supp. 3d 215 (D.P.R. 2023). Appellants appealed the dismissal of only their Lanham Act and takings claims.

## FIRST PITCH (SETTING THE TABLE)

We review the grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) de novo, taking the well-pleaded facts in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs. In re Fin. Oversight & Mgmt. Bd. for P.R., 54 F.4th 42, 52 (1st Cir. 2022). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (alteration in

- 12 -

original) (quoting Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 32 (1st Cir. 2022)). Defendants may raise affirmative defenses in a Rule 12(b)(6) motion, as the Commonwealth Defendants did here, "provided that the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'"[3] Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (alteration in original) (quoting Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 114 (1st Cir. 2009)); see also Haley v. City of Bos., 657 F.3d 39, 47 (1st Cir. 2011) (recognizing that qualified immunity "can be raised and evaluated on a motion to dismiss").

Because the Commonwealth Defendants and the Authority write separately on appeal and the district court analyzed the two motions to dismiss separately below, we take the same approach in this opinion. To that end, we first see how appellants stack up against the Commonwealth Defendants and trot out the Authority only when that's finished. Let's play ball.

---

[3] We pause to note that we (and other courts) have sometimes said that the appropriate pleading in which to raise a sovereign immunity defense is a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. See, e.g., Valentín v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001); Geomatrix, LLC v. NSF Int'l, 82 F.4th 466, 478 (6th Cir. 2023). But see LeFrere v. Quezada, 582 F.3d 1260, 1263 (11th Cir. 2009). Yet since the Commonwealth Defendants' assertion of sovereign immunity did not quibble with the facts alleged in the complaint and poses only "pure . . . questions of law," we would conduct de novo review even if the motion were styled under Rule 12(b)(1). Valentín, 254 F.3d at 363. This discrepancy thus has no bearing on our standard of review here.

**AGAINST THE STARTING PITCHER**
**(CLAIMS AGAINST THE COMMONWEALTH DEFENDANTS)**

As we prefaced in our opening remarks, the Commonwealth Defendants ask us to affirm not only because the district court correctly determined that the merits of the Lanham Act claims were not plausibly pled but also because two types of immunity (sovereign and qualified) apply. While our circuit precedent recognizes that sovereign immunity is jurisdictional in one sense, it need not be resolved before other dispositive issues. See Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys., 173 F.3d 46, 54-56 (1st Cir. 1999). In this case, even if we conclude sovereign immunity applies, we'd still need to consider the substance of the Lanham Act and takings claim. This is because appellants sue the Commonwealth officials in both their personal and official capacities, and sovereign immunity provides no protection against personal-capacity suits.[4] Lewis v. Clarke, 581 U.S. 155, 163

---

[4] The Commonwealth Defendants claim that appellants "do not clearly state whether they joined the government officials in their official or individual capacit[ies]." This is flatly contradicted by the allegations of the complaint, which seek damages from "Defendants in their individual capacities."

Below, the individual Commonwealth officials argued that allegations regarding their personal involvement were not sufficient to state a claim. The district court declined to take a definitive position on this issue. See Clemente Props., 693 F. Supp. 3d at 250. And the Commonwealth Defendants do not squarely present the issue to us again on appeal. We thus treat the Commonwealth Defendants as a collective group and make no attempt to parse the liability of individual officials in this opinion. Nothing we say today prevents the Commonwealth officials

(2017); Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 76 (1st Cir. 2019). Moreover, a qualified immunity analysis often requires assessing the merits of the claim. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (explaining that it is "often beneficial" to start a qualified immunity analysis by first determining whether "the relevant facts . . . make out a constitutional violation at all" but recognizing that judges may begin by considering whether a right is "clearly established"). Thus we believe the best approach in this case is to address the merits of appellants' Lanham Act and takings claims before moving on to sovereign and qualified immunity.

**Lanham Act**

The bulk of appellants' claims arise from the Lanham Act, a federal statute that protects against a variety of conduct, including trademark infringement, false advertising, and trademark dilution. See 15 U.S.C. § 1127 (describing the intent of the Lanham Act). Before proceeding any further in our discussion, we feel obliged to recognize that Lanham Act caselaw is filled with jargon, and there are often multiple names to describe the same or similar concepts. The parties' briefs and the district court's opinion sometimes play fast and loose with this terminology. For the sake of both laypersons and legal professionals, we offer a

from developing or raising arguments regarding their lack of individual liability on remand.

- 15 -

brief primer to make sure that everyone is looking at the same scoreboard.

As an initial matter, when discussing Lanham Act provisions, courts often cite to the section numbering of legislation as enacted, see Trademark (Lanham) Act of 1946, Pub. L. No. 79-489, Stat. 427, rather than sections of the United States Code. For example, references to "Lanham Act Section 32" correspond to 15 U.S.C. § 1114 ("Section 1114") while references to "Section 43" correspond to 15 U.S.C § 1125 ("Section 1125"). See Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 59 & nn.1-2 (1st Cir. 2008). This opinion will stick to the codified version of the statute (i.e., Section 1114) for clarity.

The Lanham Act, among its other functions, "provides federal statutory protection for trademarks." U.S. Pat. & Trademark Off. v. Booking.com B.V., 591 U.S. 549, 552 (2020). A trademark consists of a word, phrase, image, or other device that identifies goods or services as originating from a particular source. See Judson Dunaway Corp. v. Hygienic Prods. Co., 178 F.2d 461, 464 (1st Cir. 1949) (describing trademarks as "symbols or devices [serving] as identifying marks for goods" and contemplating both word and picture marks); I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 51-52 (1st Cir. 1998) (Boudin, J., concurring) (explaining that trademarks can take the form of names, logos, or even ornamental designs of a product or its packaging,

which signal the source of a good or service). The Lanham Act provides causes of action for infringement of a registered mark under 15 U.S.C. § 1114(1) (again, "Section 1114") and infringement of an unregistered mark under 15 U.S.C. § 1125(a)(1)(A) (again, "Section 1125")). B & B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. 138, 144 (2015); see Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 117 (1st Cir. 2006). As this statutory scheme suggests, a plaintiff can have rights in a trademark even if it is never registered, though registration does provide certain litigation advantages. See Borinquen Biscuit, 443 F.3d at 117. Rights in a trademark "accrue" when someone uses a mark "in connection with a particular line of business"; they "do not arise out of registration." Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 819 (1st Cir. 1987).

Whether the mark is registered or unregistered, the "touchstone" of a trademark infringement case is that the defendant's use of the same or similar mark is likely to confuse consumers as to the source of the product or service. Dorpan, S.L. v. Hotel Meliá, Inc., 728 F.3d 55, 61 (1st Cir. 2013). For famous trademarks, as appellants say they have here, the Lanham Act provides an additional layer of protection even absent any likelihood of confusion. See 15 U.S.C. § 1125(c); Jack Daniel's Props., Inc. v. VIP Prods. LLC, 599 U.S. 140, 147 (2023). The owner of a famous mark can sue for injunctive relief when someone

- 17 -

else uses the mark in a manner that impairs the mark's distinctiveness (dilution by blurring) or its reputation (dilution by tarnishment).  See 15 U.S.C. § 1125(c)(1), (c)(2)(B)-(C).

The Lanham Act also prohibits certain methods of unfair competition even when no trademark is involved.  Section 1125(a)(1)(A) -- which we described above as a vehicle for asserting infringement of an unregistered trademark —— can be invoked even when a plaintiff claims protection for something without "all the traditional indicia of a 'trademark.'"  4 McCarthy on Trademarks and Unfair Competition § 28:15 (5th ed. 2025) (discussing false endorsement claims under Section 1125(a)(1)(A)).  As will be relevant here, several of our sister circuits have recognized what some call a "false endorsement" claim under Section 1125(a)(1)(A), wherein a person's identity or persona substitutes for the trademark.  See, e.g., Souza v. Exotic Island Enters., 68 F.4th 99, 112 (2d Cir. 2023) (noting that "in a false endorsement case . . . the mark in question is the identity of the purported endorser herself" (cleaned up)); White v. Samsung Elecs. Am., Inc., 971 F.2d 1395, 1400 (9th Cir. 1992) (explaining that in false endorsement cases, "'mark' means the celebrity's persona"), as amended (Aug. 19, 1992).  Though Section 1125(a)(1)(A) is still frequently referred to as a "trademark infringement" provision, courts sometimes account for the broader nature of the provision by using a more general term like "false association."  See, e.g.,

- 18 -

Am. Bd. of Internal Med. v. Salas Rushford, 114 F.4th 42, 64 (1st Cir. 2024) (analyzing a "false association" claim under Section 1125(a)(1)(A)). For a claim under Section 1125(a)(1)(A), the text of the statute itself requires the plaintiff to show a likelihood of confusion. 15 U.S.C. § 1125(a)(1)(A).

Separately, under Section 1125(a)(1)(B), a plaintiff can, speaking at a high level, sue for false advertising if the defendant makes "a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002) (identifying elements of false advertising claim); see 15 U.S.C. § 1125(a)(1)(B). False advertising claims are limited to acts "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). And unlike a false association claim, a false advertising claim does not necessarily require proof of confusion. See Cashmere, 284 F.3d at 311 ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception.").

The list of Section 1125(a) nomenclature doesn't end there, but this covers most of what will be relevant here.[5] We

---

[5] Sometimes courts refer to Section 1125(a)(1)(A) claims as "false designation of origin" claims, especially if plaintiffs allege that a defendant misrepresented a product's country of

- 19 -

read the parties' briefs and the district court's opinion with these overlapping monikers in mind. For clarity, our discussion cites the codified sections (and subsections) of the Lanham Act. We sometimes use the term "false association" to identify claims brought under Section 1125(a)(1)(A), as opposed to "false advertising" claims under Section 1125(a)(1)(B). Where necessary, we'll specify when we refer to particular varieties of false association, such as trademark infringement and false endorsement.

Appellants' complaint and appellate briefs claim that the use of Clemente's name and image in connection with the license plates, registration tags, and Sports District implicate each provision of the Lanham Act we've described in this overview: infringement of a registered mark, false association, false advertising, and trademark dilution. Although the district court and the parties all agree that these are the distinct Lanham Act claims at issue, it is not always easy to tell from the district court's decision and the parties' briefing which Lanham Act claim is under discussion at any given point. To compound the problem, the parties' briefs frequently talk past each other, both here on appeal and in the district court. The long and the short of it is

_____

origin on the packaging. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 639 & n.8 (1st Cir. 1992). And it's not uncommon to see Section 1125(a) (either in whole or in part) described as the "unfair competition" provision of the Lanham Act. ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 924 (6th Cir. 2003).

that to properly assess the arguments on appeal, we must impose order on chaos and thus spend more time than usual in this opinion summarizing what occurred below and what is argued presently. We beg the gentle reader's patience throughout.

**Use in Commerce and Commercial Use**

The heart of the parties' dispute on the merits of the Lanham Act is whether Clemente's name and image were used in commerce or used in connection with goods and services. This is so because the district court perceived a failure to plead "use in commerce" or use "in connection with goods or services" as a fatal flaw for every Lanham Act claim. See Clemente Props., 693 F. Supp. 3d at 241-43.[6] The district court sometimes referred to one or both requirements as "commercial use." Id. at 241, 243; see also 3 McCarthy, supra, § 23:11.50 (noting that the statutory requirement that use be in connection with goods and services is "sometimes referred to as the 'commercial use' requirement").[7]

---

[6] The district court analyzed the issue in-depth only with respect to the trademark infringement claim under Section 1114(1). See Clemente Props., 693 F. Supp. 3d at 243-44. But its opinion suggested that it believed the same reasoning applied to claims under both Sections 1125(a) and Section 1125(c). See id. at 245 (explaining that appellants' Section 1125(a)(1)(A) claim "again fail[s] to allege 'use in commerce' and 'in connection with goods or services'"); id. at 246 (declining to "further analyze Plaintiffs' dilution claim, as it also fails on the same grounds as the other two Lanham Act claims").

[7] Unfortunately, the district court embarked on this analysis without the benefit of meaningful briefing by the parties on the motion to dismiss. Reaching these issues was not necessarily

- 21 -

But before we delve into our analysis, we briefly clear away some underbrush. Appellants take umbrage with the district court's discussion of commercial use on multiple fronts, including the district court's reliance on the "restrictive" definition of "use in commerce" provided in 15 U.S.C. § 1127 ("Section 1127"), which they imply sets a standard for commercial use that was too favorable to the Commonwealth Defendants.[8] But given the district court's bottom-line holding, we need not weigh in on this potential statutory interpretation pitfall because we do not see (and appellants have not articulated) how this misstep (if one exists) prejudiced or influenced the district court's ultimate view of appellants' case. The primary focus of the district court's commerciality analysis was whether appellants truly alleged

---

improper. We've previously recognized that "[d]istrict courts retain the power to dismiss complaints sua sponte for a failure to state a claim," especially where a dispositive issue of law exists. Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 14 (1st Cir. 2024). But we've also warned that dismissing cases without the guiderails of party briefing is "risky business." González-González v. United States, 257 F.3d 31, 37 (1st Cir. 2001).

[8] Appellants argue Section 1127's definition of "use in commerce" only applies when assessing whether an individual sufficiently used a word or phrase in commerce to develop trademark rights and met the requirements for registering said trademark, a position favored by the Ninth Circuit. See, e.g., Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005). A thoughtful examination of how the history and text of the Lanham Act militate against the district court's reliance on Section 1127's "use in commerce" definition is provided in the appendix to the Second Circuit's decision in Rescuecom Corporation v. Google Incorporated, 562 F.3d 123, 131-41 (2d Cir. 2009) (dicta).

"'goods or services' in controversy," which is what would be needed to trigger Sections 1114 and 1125's coverage. See Clemente Props., 693 F. Supp. 3d at 243. To that end, the district court seemed to have merely referenced the "use in commerce" definition to bolster the fact that a use in connection with goods or services was statutorily required. Id. at 242 (explaining that a use in commerce "can occur when the trademark is used on goods for sale, or 'in the sale or advertising of services'" (quoting 15 U.S.C. § 1127)). Appellants do not dispute that use in connection with "goods" or "services" is, indeed, a necessary element of each of their Sections 1114 and 1125 claims, regardless of what "use in commerce" might mean. And it is telling that the Commonwealth Defendants never refer to Section 1127's definition of "use in commerce" in their defense of the decision below. Therefore, we will focus our opinion on the district court's primary justification for its dismissal, that is, whether the Commonwealth Defendants used Clemente's name or image[9] with a "good" or "service" under Sections 1114 and 1125.[10]

_____

[9] We refer to the use of Clemente's name and image throughout this section rather than the "mark" because the analysis here impacts the claims under Section 1125(a), which do not necessarily require use of a trademark.

[10] Unlike Sections 1114(1) and 1125(a), Section 1125(c)(1) does not expressly refer to "goods" or "services." No party disputes that a defendant must act in connection with goods and services to violate Section 1125(c) or argues that a different test applies for a dilution claim. See Bird v. Parsons, 289 F.3d

License Plates and Registration Tags

The cornerstone of the district court's commercial use analysis was simply that license plates and vehicle registration tags are "not the classes of products or services that trademark law protects" and that "issuing motor vehicle license plates and tags cannot be considered commercial use, as it is a clear government activity." Clemente Props., 693 F. Supp. 3d at 243. Appellants assert that license plates and registration tags do fall within the ambit of trademark law and that the "commercial use" required by the Lanham Act is sufficiently broad to cover government activity.[11] Commonwealth Defendants' discussion of this issue consists almost entirely of quotes from the district court's opinion, which they say got it right.

Appellants have the better side of this argument. Courts have interpreted the "in connection with goods or services"

_____

865, 879 (6th Cir. 2002) (requiring that the accused diluter "engage in the commercial use in commerce" by using the mark as a trademark (cleaned up)). For the purposes of this opinion, we assume that the success of the dilution claim rises and falls with the district court's determination of whether there was a use in connection with "goods or services" sufficient to sustain the other Lanham Act claims.

[11] Appellants argue in the alternative, with respect to their Section 1114 claim, that the registered mark itself is the relevant good or service. We see no need to reach this contention given that Clemente's name and image appear on license plates and are not being sold unattached to any good or service. See, e.g., Bos. Pro. Hockey Ass'n v. Dall. Cap & Emblem Mfg., 510 F.2d 1004, 1009-10 (5th Cir. 1975) (concerning the sale of cloth reproductions of the trademarks).

requirement to cover a broad range of products. See United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 89-90 (2d Cir. 1997) (concluding that non-profit political activities fell within the meaning of "services" covered by the Lanham Act, which "applie[s] to defendants furnishing a wide variety of non-commercial public and civic benefits"); see also Lamparello v. Falwell, 420 F.3d 309, 314 (4th Cir. 2005) ("[C]ourts have been reluctant to define [use in connection with goods or services] narrowly."). Judicial attempts to define "goods" have relied on general-purpose definitions from the Uniform Commercial Code and legal dictionaries. See LegalForce RAPC Worldwide, PC v. LegalForce, Inc., 124 F.4th 1122, 1126 (9th Cir. 2024) ("Equity is not a 'good' for purposes of the Lanham Act, because it is not a movable or tangible thing." (citing U.C.C. § 2-105; and then citing Goods, Black's Law Dictionary (12th ed. 2024))); Radiance Found., Inc. v. NAACP, 786 F.3d 316, 323 (4th Cir. 2015) (defining a good as "a valuable product, physical or otherwise, that the consumer may herself employ" and a service as "an intangible commodity in the form of human effort, such as labor, skill, or advice" (first quoting Goods, Black's Law Dictionary (10th ed. 2014); and then quoting Services, Black's Law Dictionary (10th ed. 2014))). Those definitions naturally encompass a "wide range of products." Radiance Found., 786 F.3d at 324.

Here, the complaint alleges that the Commonwealth Defendants collected money in exchange for license plates and registration tags bearing Clemente's name and image. Logic dictates that the license plates and registration tags are the relevant products in this case.[12] Indeed, federal courts have heard Lanham Act cases against defendants who use infringing trademarks on license plates on multiple occasions without questioning whether such items constitute goods or services. See, e.g., Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc., 603 F.3d 1133, 1134 (9th Cir. 2010) (describing two car manufacturers' lawsuit against a company that manufactured automobile accessories including license plates bearing the manufacturers' logos); OBX-Stock, Inc. v. Bicast, Inc., No. 2:04-CV-45-BO, 2006 WL 8442143, at *1 (E.D.N.C. June 12, 2006) (describing a trademark dispute between companies using similar marks on various products, including license plates), aff'd, 558 F.3d 334 (4th Cir. 2009); Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167,

---

[12] At oral argument, a suggestion arose that there was no "sale" of the license plates and registration tags because their purchase was mandated by regulation, rather than a voluntary exchange. The district court did not rely on the mandatory nature of the exchange, nor was this argument raised in any of the parties' briefs, so we do not address that wrinkle here. See Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1449 (1st Cir. 1995) ("This argument, not presented below and made for the first time at oral argument, is waived."). We note, in any event, that the complaint does allege that the Commonwealth's program involved some voluntary sales and donations.

1170 (11th Cir. 2002) (describing evidence of a radio station's use of an infringing logo on various items and advertisements, including license plates); Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev., 170 F.3d 449, 451 (4th Cir. 1999) (describing a trademark dilution case against Utah for the display of an allegedly diluting slogan on motor vehicle license plates and other advertising).  Underscoring that license plates and registration tags are mundane examples of goods or services that fall within the ambit of trademark law, appellants cite to the USPTO's (to remind, United States Patent and Trademark Office) Trademark ID Manual, which compiles and classifies acceptable identifications of goods and services for the purposes of trademark registration.[13]  The Manual specifically contemplates the registration of trademarks of items like license plates.[14]  See generally Trademark ID Manual, ID Master List, USPTO, https://idm-

---

[13] For example, Apple, Inc. has registrations in the mark APPLE for computers and computer programs, which falls within class 9.  APPLE, Registration No. 1,078,312.  Meanwhile, a business named Westgate Chevrolet, Inc. has registered the same mark for automobile dealerships (class 35) and automobile repair services (class 37).  APPLE, Registration No. 2,922,072.

[14] We are somewhat skeptical of appellants' reliance on the Trademark ID Manual throughout their opening brief, but we note appellants' citation to the Trademark ID Manual only because it tends to show that license plates and registration tags are not categorically excluded from "goods or services" under the Lanham Act as the district court suggests.  To the extent that appellants believe that the inclusion of certain items in the USPTO Trademark ID Manual has some further significance in establishing its Lanham Act claims, it has provided no support for such a notion.

tmng.uspto.gov/id-master-list-public.html [https://perma.cc/RYK4-APKV] (providing searchable database).

The district court seemingly believed that items issued by the government cannot be goods or services. See Clemente Props., 693 F. Supp. 3d at 243 (first citing Perry v. McDonald, 280 F.3d 159, 169 (2d Cir. 2001); and then citing Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015)). While trademark owners suing state governments have generally lost, neither the district court nor the Commonwealth Defendants cite a case suggesting that government activities are inherently, or even presumptively, non-commercial. See Ringling Bros., 170 F.3d at 451 (recognizing that a Utah agency used a trademarked slogan "in connection with Utah tourism services" but concluding that the plaintiff failed to establish likelihood of dilution); Mihalek Corp. v. Michigan, 814 F.2d 290, 292, 296-97 (6th Cir. 1987) (considering a trademark claim against Michigan based on the use of a slogan in an advertising and promotional campaign focused on Michigan tourism, agriculture, and business, and affirming determination that there was no likelihood of confusion), on reh'g, 821 F.2d 327 (6th Cir. 1987).[15] And though the majority of Lanham

---

[15] Governments are not only accused infringers in trademark cases. They also assert ownership of their own trademarks by virtue of their use of slogans, logos, and other devices in connection with goods and services. See Fla. VirtualSchool v. K12, Inc., 773 F.3d 233, 235-36 (11th Cir. 2014) (recognizing that

- 28 -

Act claims involving license plates are asserted against novelty or decorative license plates manufactured by private companies, at least a few target a defendant's use of an infringing mark on state-issued license plates. See Ringling Bros., 170 F.3d at 451 (lawsuit against Utah for use of a slogan on license plates to advertise winter sports attractions); Raptor Educ. Found. v. Rocky Mountain Raptor Program, No. 10-CV-01222-WDM-MJW, 2010 WL 4537119, at *1 (D. Colo. Nov. 3, 2010) (lawsuit against a non-profit defendant using the plaintiff's trademarked specialty license plate where the Colorado legislature amended a statute governing specialty license plates to permit issuance of a specialty plate to the defendant).

As appellants point out, the district court supported its conclusion that license plates and registration tags are not "classes of products or services" with citations to First Amendment cases involving custom license plates. See Clemente Props., 693 F. Supp. 3d at 243 (first citing Perry, 280 F.3d at 169; and then citing Walker, 576 U.S. 200). In these cases, private parties argued that the First Amendment required the state to issue customized license plates with words or phrases the state deemed offensive. Walker, 576 U.S. at 206 (describing a state's denial of an application of specialty license plates displaying a

_____

a Florida agency owns enforceable trademarks that it uses "in connection with its online education program").

Confederate battle flag and referencing "Sons of Confederate Veterans"); Perry, 280 F.3d at 163 (considering whether the revocation of "SHTHPNS" vanity plates violates First Amendment or due process rights). At a high level, these opinions recognize that speech on license plates is associated with the government, and the government may refuse to issue custom plates to avoid being associated with offensive language. See Walker, 576 U.S. at 207-09; Perry, 280 F.3d at 169-70.[16] But even assuming that the public might associate expressive activity on a government-issued license plate with the Commonwealth, we fail to see how that fact makes the license plates themselves any less of a good or service.[17] Accordingly, we disagree with the district court that license

---

[16] Our above-line description generalizes Walker and Perry. There are differences between these two cases, which might prove important in a First Amendment case. Compare Walker, 576 U.S. at 207-09 (concluding that a specialty license plate amounted to government speech), with Perry, 280 F.3d at 169-70 (concluding that a vanity license plate was a nonpublic forum). But no First Amendment argument is raised here. And as far as we can tell, the district court cites the First Amendment cases only to establish a link between license plates and governments.

[17] At best, this reasoning seems to go to likelihood of confusion (i.e., nobody would have been confused as to the source of the license plates because everyone knows license plates come from the government). See WCVB-TV v. Bos. Athletic Ass'n, 926 F.2d 42, 45-46 (1st Cir. 1991) (concluding that there would be no sponsorship confusion in part because (1) the television broadcaster offered to air frequent disclaimers that coverage of plaintiff's sports event was unofficial and (2) viewers would not care about sponsorship of broadcast). But the district court expressly stated that it did not need to reach likelihood of confusion for the Section 1114 claim. Clemente Props., 693 F. Supp. 3d at 243.

plates and registration tags cannot be goods or services under the Lanham Act.

The district court mentioned an alternative basis for its conclusion that commercial use was not adequately pled, which it supported with a citation to Utah Republican Party v. Herbert, 141 F. Supp. 3d 1195, 1205 (D. Utah 2015). According to the district court, Utah Republican stands for the proposition that "[u]nless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked." Clemente Props., 693 F. Supp. 3d at 242 (quoting Utah Republican, 141 F. Supp. 3d at 1204). Later in its opinion, the district court commented that appellants' Lanham Act claims failed because "they have not alleged that they actually provide the same 'goods or services'" as the government. Id. at 243 (emphasis added). Essentially, the district court seemed to say that even if license plates were goods or services, appellants could not state a claim unless they provided the same goods or services as the government. Neither party has confronted this aspect of the district court's commercial use analysis. But because the district court's opinion arguably presents the absence of "competing" goods or services as an alternative basis on which we could affirm, we alight briefly on this here.

The district court's assumption that a trademark infringement claim (or any Lanham Act claim) can only stand if the

plaintiffs provide the same goods or services as the defendant is not consistent with the caselaw.  See, e.g., Halicki Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213, 1227-28 (9th Cir. 2008) (holding that a trademark owner has standing to sue for infringement even if her mark is registered for a class of products "that does not compete directly with the defendant's products" and explaining that relatedness of the parties' goods "is, by contrast, a merits question"); Team Tires Plus, Ltd. v. Tires Plus, Inc., 394 F.3d 831, 833 (10th Cir. 2005) (explaining that the view "that a trademark provides protection only when the defendant uses the mark on directly competing goods . . . is no longer good law" and has not been since the early 1900s); Beacon Mut. Ins. v. OneBeacon Ins. Grp., 376 F.3d 8, 16 (1st Cir. 2004) (explaining that the Lanham Act is not "restricted" to the "classic situation" where the "case involves directly competing goods").  The similarity of the parties' product lines or service offerings is one factor among many that a court might consider when deciding whether there is likelihood of confusion.  See Beacon Mut., 376 F.3d at 15.  This factor would not make sense if the only "goods or services" protected by trademark law were the same "goods or services."  To the extent Utah Republican implies that all trademark infringement or Lanham Act claims require competition between the plaintiff and the defendant, we disagree.

Utah Republican relies on two lines of cases. 141 F. Supp. 3d at 1204-05 (first citing Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch., 527 F.3d 1045, 1052-53 (10th Cir. 2008); and then citing Wash. State Republican Party v. Wash. State Grange, 676 F.3d 784, 795 (9th Cir. 2012)). One line concludes that there is no commercial use (i.e., no use in connection with goods and services) where a defendant uses a plaintiff's trademark merely to comment on or criticize the plaintiff. See Utah Lighthouse, 527 F.3d at 1048-49, 1052-54 (concluding that a parody website was non-commercial where it provided no goods and services, earned no revenue, did not link to any commercial sites, and merely "comment[ed] on the trademark owner's goods or services" (citing, among other cases, Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 672 (9th Cir. 2005))); Bosley, 403 F.3d at 677-80 (concluding that a dissatisfied customer's use of mark in the domain name of a highly critical website was not in connection with the sale of goods or services); see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 209-10 (1st Cir. 1996) (Saris, J., concurring) (opining that there is no commercial use of a union-plaintiff's mark where the defendant-employer distributed anti-union pamphlets that displayed the union's logo and purported to be written on union letterhead). These cases suggest that where there is no "sale of goods or services," the absence of competition

- 33 -

between the parties shows that the defendant's use of the plaintiff's mark was merely "in connection with the expression of [the defendant's] opinion <u>about</u> [the plaintiff's] goods and services," rather than to offer its own goods and services as necessary to violate the Lanham Act.  <u>Bosley</u>, 403 F.3d at 679. The other case cited by <u>Utah Republican</u>, <u>Washington State Republican</u>, applied this principle in the context of a state government's use of a political party's mark on ballot labels. 676 F.3d at 795.  In rejecting the trademark claims, which were an ancillary issue, the Ninth Circuit noted that commercial use does not require an "actual <u>sale</u>" of goods or services, but "[a]t minimum . . . the plaintiff must show that the defendant 'offers <u>competing</u> services to the public.'"  <u>Id.</u> (quoting <u>Bosley</u>, 403 F.3d at 679).

At best, then, <u>Utah Republican</u> stands for the proposition that there may be some subset of trademark cases in which no sale of goods or services by the defendant is contemplated (such as when the defendant criticizes the plaintiff), and competition helps illuminate whether the defendant used an infringing mark on goods or services.  Even if we accepted the view of these non-binding cases, the factual allegations of this complaint are not analogous.  Drawing all reasonable inferences in favor of appellants, as we must, the Commonwealth Defendants did not use Clemente's name or image simply to offer commentary about

Clemente or to conduct some administrative government task. The Commonwealth Defendants placed Clemente's name and image on license plates and registration tags and then charged a special fee to members of the public in exchange for those "commemorative" products. None of the cases we've just described features an analogous sale or exchange of a product bearing the plaintiff's claimed mark (or other device) for money. We thus see no reason to dismiss the Lanham Act claims on the basis that there was no "competing" service offered by the government here.

Having thoroughly mined the district court's opinion for any basis on which we could affirm its holding as to the license plates and registration tags, we agree with appellants that the ruling is unsupported.[18]

---

[18] The district court also devoted some space in its commerciality discussion to the "historical significance" of the 50th anniversary of Clemente's 3,000th hit and "the public value of information about the game of baseball and its players." Clemente Props., 693 F. Supp. 3d at 244. The parties don't linger on this point on appeal, and it is not immediately evident how this fact influenced the district court's analysis. We note that the two cases the district court cited in support of this point discuss the public interest in baseball in the context of First Amendment limitations on a plaintiff's right of publicity, rather than commerciality under the Lanham Act. See C.B.C. Distrib. & Mktg., Inc. v. MLB Advanced Media, L.P., 505 F.3d 818, 823 (8th Cir. 2007); Cardtoons, L.C. v. MLB Players Ass'n, 95 F.3d 959, 972 (10th Cir. 1996). The brief discussion of the Lanham Act in Cardtoons turned primarily on likelihood of confusion grounds. 95 F.3d at 966-67.

The Sports District

A careful reader will note that our discussion of commerciality and "goods or services" has thus far focused on the license plates and registration tags, without mentioning the Sports District. Appellants argue that dismissal of claims of "trademark infringement under the Lanham Act regarding the creation of the Roberto Clemente Sports District . . . . must be reversed" because the district court "[s]urprisingly" did not analyze it. Indeed, although the district court mentions "Act 67-2022" at various points in its analysis of the merits of the Lanham Act claims, it never addressed the Sports District as a potential good or service with respect to the Commonwealth Defendants, or otherwise assessed use of Clemente's name in relation to the Sports District as a good or service. See Clemente Props., 693 F. Supp. 3d at 240-46.

The allegations surrounding the Sports District are tied to the other claims against the Commonwealth Defendants. Proceeds from the sale of license plates and registration tags were set aside to raise money for the Sports District. And the Commonwealth Defendants invoked Clemente's name when soliciting donations for the Roberto Clemente Sports District Fund. Neither the district court's opinion nor the Commonwealth Defendants' brief gave any rationale for why a trademark infringement claim could not proceed against defendants who use someone's name or image to solicit

donations in support of public non-profit services, including sports and recreation. See, e.g., United We Stand, 128 F.3d at 90. Moreover, the Commonwealth Defendants offer no basis for why we should consider the Sports District itself a non-commercial use, much less defend the district court's approach.[19] Accordingly, to the extent that allegations regarding the Sports District might supply a distinct basis for infringement, we consider this an open issue for the district court to decide on remand.

\*

For the reasons above, we conclude that the district court erred in holding that appellants failed to allege any use of Clemente's name or image in connection with goods or services, at least for the reasons given in the opinion below -- namely, that license plates and registration tags are not the "classes of products" protected by trademark law and the governmental nature

---

[19] The district court did conclude that allegations regarding the Authority failed to allege use in commerce or commercial use. See Clemente Props., 693 F. Supp. 3d at 252-53. (Recall that the only allegations relating to the Authority have to do with the Sports District.) But the court's holding with respect to the Authority does not seem to have any bearing as to the Commonwealth Defendants. This is because the district court understood the only allegations relating to the Authority to be that the Authority violated the Lanham Act "by its mere inclusion or mention in the dispositions of Act 67-2022." Id. at 253. (We say more about the district court's reasoning when we address the claims against the Authority.) The Commonwealth Defendants' alleged actions comprise more than mere mention in Act 67-2022.

of such products.  What does this mean for the outcome of this case?  As we said above, the district court considered the failure to allege "commercial use" a sufficient basis on which to dismiss each Lanham Act claim.  See Clemente Props., 693 F. Supp. 3d at 242-46.  For claims under Sections 1114 and 1125(c) (infringement of the registered mark and trademark dilution), this was the only basis stated for dismissal of the Lanham Act claims on the merits.[20]  See id. at 242-44.  For the claims under Section 1125(a), however, the district court offered several additional bases for dismissal (which appellants separately challenge on appeal).  We consider those now, focusing first on 15 U.S.C. § 1125(a)(1)(A) (false association or unregistered trademark infringement), and then on § 1125(a)(1)(B) (false advertising).

**False Association, Section 1125(a)(1)(A)**

The district court offered myriad rationales, aside from lack of commercial use, for why the "claims under Section 43(a)" should be dismissed.  See Clemente Props., 693 F. Supp. 3d. at 244-46.  Section 1125 contemplates two distinct causes of action.  See 15 U.S.C. § 1125(a)(1)(A) (false association or unregistered trademark infringement); § 1125(a)(1)(B) (false advertising); Clemente Props., 693 F. Supp. 3d. at 244-45; see also Lexmark

---

[20] Thus we need not address other issues raised in appellants' brief, such as likelihood of confusion or dilution by tarnishment, with respect to those claims.

Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 122 (2014). We hinted earlier that identifying which cause of action (if not both) the district court's opinion was referring to at any given time is an exercise in close reading.[21] As best we can tell, there were three reasons for dismissal of the Section 1125(a)(1)(A) claim. First, the court believed that appellants failed to establish standing under the Lexmark zone-of-interests test. See Clemente Props., 693 F. Supp. 3d at 245. Second, the district court held that any claim based on "use of the image of Roberto Clemente" could not proceed because "[n]o reasonable jury could find a likelihood of confusion." Id. at 246 (quoting ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 923 (6th Cir. 2003)). Finally, the district court concluded that the complaint "reflects a conclusory and formulaic recitation of certain elements of a trademark infringement cause of action that is insufficient to survive a motion to dismiss." Id. at 246. We address appellants' position about each line of reasoning.

---

[21] For instance, the heading of the section of the opinion that deals with Section 1125 is titled "False Advertising Under the Lanham Act," notwithstanding the fact that the discussion that follows includes the "false association claim under subsection A" and touches on the "dilution claim." Clemente Props., 693 F. Supp. 3d at 244, 246. Likewise, one paragraph begins as a discussion of why, "as a false advertising claim, Plaintiffs' cause is plainly insufficient" but goes on to cite a trademark infringement case. Id. at 245-46 (citing Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990)).

Zone-of-Interests Test

In Lexmark, the Supreme Court articulated a test for determining whether someone was "within the class of plaintiffs" allowed to bring a false advertising claim under the Lanham Act, or to use the legal jargon, whether, as a matter of statutory interpretation, a plaintiff is within the "zone of interests" protected by Section 1125(a).  See 572 U.S. at 128-29.  (This concept sometimes goes by the name "statutory standing."  Id. at 128 n.4.)  "To invoke the Lanham Act's cause of action for false advertising," the Supreme Court held, "a plaintiff must plead . . . an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  Id. at 140.  The district court applied this test to both the false association (or unregistered trademark infringement) claim under Section 1125(a)(1)(A) and the false advertising claim under Section 1125(a)(1)(B)[22] and concluded that appellants suffered no injury to a commercial interest because there was no allegation that the Commonwealth Defendants' actions

--------------------------------------------------

[22] Because appellants do not challenge this approach, we assume without deciding that the Lexmark test can be applied to Section 1125(a)(1)(A).  But we pause to note that Lexmark may well have intended to set forth a zone-of-interests test only with respect to false advertising.  See 572 U.S. at 131-32.  In a claim for trademark infringement, it's hard to imagine much debate that the owner of a trademark is within the class of plaintiffs entitled to sue under Section 1125(a)(1)(A).  See Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 159 (1st Cir. 1977).

"caused consumers to withhold trade from them." Clemente Props., 693 F. Supp. 3d at 245 (cleaned up). Appellants urge us to consider their allegations of reputational injury caused by the Commonwealth's actions. And they point out that this court has independently recognized that the "relevant commercial injury" under Section 1125(a) "includes not only loss of sales but also harm to the trademark holder's goodwill and reputation." Beacon Mut., 376 F.3d at 10. We agree that the district court took too narrow a view of what constitutes commercial injury. The district court should have considered appellants' allegations of reputational harm, even if there were no express allegation regarding a loss of sales, because Lexmark plainly contemplates an injury to either "sales or business reputation." 572 U.S. at 140 (emphasis added); cf. Welch Foods, Inc. v. Nat'l Union Fire Ins. Co., 659 F.3d 191, 194 (1st Cir. 2011) (explaining that "the word or must be given effect" when interpreting a contract).

While not everyone who faces public criticism or negativity necessarily suffers a cognizable commercial injury under Section 1125(a), Lexmark, 572 U.S. at 140 (requiring "an injury to a commercial interest in . . . business reputation" (emphasis added)), here, appellants made plausible allegations that their business reputation in Puerto Rico was harmed by association of Clemente's name and image with an unpopular product (the license plates and registration tags). Taking the complaint's

allegations as true and drawing all plausible inferences in favor of our appellants, appellants' business interests in licensing the Clemente mark for merchandise or other projects were plausibly impacted by this public blowback. This is especially so where appellants' business reputation is built in part on an association with charitable endeavors, and the public backlash was in response to the perceived extortionate nature of the commemorative license plates and registration tags, goods that all Puerto Rico residents who needed new plates or tags in 2022 were forced to purchase. See Beacon Mut., 376 F.3d at 16 (holding that relevant confusion may be shown not only in trademark owner's "actual or potential" customers but also "others whose confusion threatens the trademark owner's commercial interest in its mark"). We thus conclude that appellants adequately pled a commercial injury within the zone of interests of Section 1125(a) to survive a motion to dismiss. See Advance Dx, Inc. v. YourBio Health, Inc., 753 F. Supp. 3d 53, 68 (D. Mass. 2024) (concluding that a reputational injury was adequately alleged under Lexmark where the complaint alleged that the defendant's actions "adversely . . . affected [the plaintiff's] reputation in the community as a provider of accurate and reliable" products); cf. Souza, 68 F.4th at 119-20 (recognizing that reputational injury that "may have" limited plaintiffs' "work opportunities" "would likely satisfy Lexmark's requirements" but

affirming dismissal on summary judgment where the plaintiff provided no evidence supporting that claimed injury).

### No Claim Based on Clemente's Image

We turn then to the district court's rationale that no one could have been confused by the use of Clemente's image on the license plates. See Clemente Props., 693 F. Supp. 3d. at 245-46. In so stating, we understand the district court to be holding that there was no valid claim for infringement of an unregistered mark in Clemente's image. In support, the district court cited a Second Circuit case involving the trademarked name of another "baseball legend," Babe Ruth. Id. at 245 (citing Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990)). In Pirone, Ruth's daughters sued the publisher of a baseball calendar that contained three photos involving Ruth, along with photographs of many other famous baseball players. Pirone, 894 F.2d at 581. The Second Circuit affirmed summary judgment for the calendar publisher on the claims under Section 1114 (infringement of a registered mark) and Section 1125(a)(1)(A) (false association). Pirone, 894 F.2d at 582, 586. The district court seemed to have drawn two main points from this case. First, the district court expressed skepticism that appellants had any trademark rights in images of Clemente. See Clemente Props., 693 F. Supp. 3d. at 245-46 ("[A]s a general rule, a person's image or likeness cannot function as a trademark." (alteration in original) (quoting ETW Corp., 332 F.3d at 922)).

And second, the district court believed that Pirone's conclusion that no reasonable juror could be confused by Ruth's photographs in the calendar applied equally to this case. See id. at 246. We start with the first point.

Pirone, as the district court noted, holds that "photograph[s] of a human being" do not "inherently" serve a source identifying function (or to use trademark lingo, they are not "inherently 'distinctive'"). Id. at 245 (quoting Pirone, 894 F.2d at 583). While it might be possible to establish trademark rights in a photograph of a human being, the plaintiff would need to show that "a particular photograph was consistently used on specific goods." Pirone, 894 F.2d at 583. Our assessment of how Pirone applies to this case is clouded by the fact that appellants never come right out and say whether they assert any unregistered rights in an image of Clemente. Here is what we gather from the breadcrumbs appellants have dropped.

We know that (1) appellants have a registered mark in the words "Roberto Clemente" and (2) appellants believe that "any pictorial depiction of Roberto Clemente," the human being, "is a legal equivalent for trademark purposes." Appellants' brief discusses "legal equivalents" in the context of their Section 1114 claim for infringement of a registered mark, asserting that "a picture mark can infringe a word mark where the picture is a depiction of the word." (quoting Fleischer Studios, Inc. v.

A.V.E.L.A., Inc., 925 F. Supp. 2d 1067, 1077 (C.D. Cal. 2012)). We read this as an assertion that appellants' registered mark has been infringed by the use of Clemente's image on the license plates and registration tags.[23] But this gives no indication either way whether appellants also assert ownership over an unregistered trademark in Clemente's image. In the context of Section 1125(a), appellants' brief makes multiple assertions that the Commonwealth defendants used "the trademark" without explaining what that mark is (or is not). So we agree with the district court that, to the extent appellants are asserting unregistered trademark rights in some image of Roberto Clemente (either similar or identical to the ones used by the Commonwealth on its license plates and registration tags), they failed to adequately plead such rights. The complaint does not allege that appellants consistently used a particular image of Clemente in connection with goods or services, such that it became an identifier of the source of those goods or services. See Pirone, 894 F.2d at 583; ETW Corp., 332 F.3d at 923 (rejecting "a sweeping claim to trademark rights in every photograph and image of [Tiger] Woods," the golfer).

---

[23] We take no sides on this issue, which was not addressed in the district court's opinion or the appellees' brief. The district court may not have seen any need to address this point, which was included in appellants' opposition to the motion to dismiss below, because appellants alleged that the word "Clemente" appeared on the license plates and registration tags. There was thus no need to resort to "legal equivalence" between words and images to understand what infringement occurred.

But appellants have another angle under Section 1125(a)(1)(A). Echoing the allegations of their complaint, they say they have a claim that is "equivalent" but also "differ[ent] from" a right of publicity claim under state law.[24] Based on this description and the cases appellants cite, see Electra v. 59 Murray Enters., 987 F.3d 233, 257 (2d Cir. 2021); ETW Corp., 332 F.3d at 924; Parks v. LaFace Recs., 329 F.3d 437, 445 (6th Cir. 2003), we understand appellants to be asserting what we earlier called a false endorsement claim under Section 1125(a)(1)(A), something which the district court seemingly missed.[25] A false endorsement

---

[24] The phrase "right of publicity" refers to a tort under state law, which, in general terms, "recognize[s] the right of well known individuals to control commercial exploitation of their names and likenesses." Bi-Rite Enters. v. Bruce Miner Co., 757 F.2d 440, 442 (1st Cir. 1985); see Hepp v. Facebook, 14 F.4th 204, 223 (3d Cir. 2021) (Cowen, J., concurring in part) (collecting sources to demonstrate variation in the right of publicity claim between states). Separately, courts have recognized Section 1125(a)(1)(A) as a federal vehicle for bringing claims against the unauthorized commercial use of an individual's name or likeness. Using the phrase "right of publicity" here wrongly implies that appellants are asserting a claim under Puerto Rico law, which has different elements than the federal false endorsement claim. In particular, a state right of publicity claim does not usually require any showing of confusion, meaning that it can "potentially" be read "more expansive[ly]" than the Lanham Act. Rogers v. Grimaldi, 875 F.2d 994, 1004 (2d Cir. 1989).

[25] Appellants make it more difficult than necessary to identify what their Section 1125(a)(1)(A) claim is by insisting on calling Section 1125(a) "the federal equivalent protection of the right of publicity." Similarly, although their opposition to the motion to dismiss below expressly asserted rights in "an individual's image or likeness" under Section 1125(a) "akin to that of a traditional trademark holder," this helpful information about their false endorsement claim appeared confusingly under the

- 46 -

claim recognizes a right in a persona or identity and permits suit under Section 1125(a)(1)(A) when "endorsement of a product is implied through the imitation of a distinctive attribute of the [person's] identity." Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1066-67, 1068-69 (9th Cir. 2015) (cleaned up) (affirming a verdict in favor of the musician Bob Marley's children against a defendant who used Marley's photographs on T-shirts and other merchandise); see also Souza, 68 F.4th at 109 (considering a false endorsement claim by professional models based on the defendant's use of their photographs in strip club advertisements); Facenda v. NFL Films, Inc., 542 F.3d 1007, 1014-15, 1023-25 (3d Cir. 2008) (considering whether the use of a football broadcaster's voice in a television program about the production of a football video game falsely implied the broadcaster's endorsement of the video game). In such cases, as we've already noted, an aspect of a persona or identity takes the place of a traditional trademark. Compare Souza, 68 F.4th at 112 ("In a false endorsement case like this one, the 'mark' in question is the identity of the purported endorser herself."), and White, 971 F.2d at 1400 ("In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona."), with Donoghue v. IBC USA (Publ'ns), Inc., 70 F.3d 206, 218 (1st

heading "Right of Publicity." We think that calling any claim under Section 1125(a) a "right of publicity" claim is misleading.

- 47 -

Cir. 1995) (affirming the conclusion that a plaintiff's "name was worthy of trademark protection"). To assert a false endorsement claim, appellants may not need to assert trademark rights in a particular photograph of Clemente; instead, their claim would be based on the Commonwealth's use of Clemente's likeness, which amounts to a "symbol" or "device" under Section 1125(a)(1)(A). See Fifty-Six Hope, 778 F.3d at 1068-69. In short, Section 1125(a)(1)(A) seemingly permits appellants to bring a claim based on Clemente's image even absent a trademark. Because the district court never considered this possibility and the Commonwealth Defendants do not argue against appellants' false endorsement theory on appeal, an issue this circuit has not addressed on the merits before, we will not affirm dismissal of the Section 1125(a)(1)(A) claim on the ground that there was no plausible trademark in Clemente's photograph.[26]

---

[26] False endorsement cases have been appealed to this circuit, but we resolved those appeals without diving into the nitty gritty of the claims. See Ji v. Bose Corp., 626 F.3d 116, 120, 128-30 (1st Cir. 2010) (recounting that the district court had dismissed the plaintiff's false endorsement claim and assessing whether the district court correctly denied a motion for attorney's fees), abrogated by Dupree v. Younger, 598 U.S. 729 (2023); McBee v. Delica Co., 417 F.3d 107, 111 (1st Cir. 2005) (describing a false endorsement claim by a "well-known American jazz musician" against a Japanese clothing company and affirming dismissal on jurisdictional and standing grounds). Because appellants describe their false endorsement claim only in broad strokes, and the Commonwealth Defendants do not make any arguments against appellants' reliance on false endorsement caselaw, we have no occasion to comment on the exact boundaries of such a claim. We

- 48 -

That said, likelihood of confusion is still an element of a false endorsement claim. Fifty-Six Hope, 778 F.3d at 1069-71; 15 U.S.C. § 1125(a)(1)(A). Thus, we turn to the second principle the district court seemed to have drawn from Pirone, that it would be impossible for a reasonable jury to find a likelihood of confusion based on a photograph of a famous baseball player. See Clemente Props., 693 F. Supp. 3d at 246. Appellants criticize the district court for ignoring allegations regarding confusion, which they assert "naturally happened." Strangely, neither the district court nor the parties cited the multi-factor balancing test this court applies when assessing whether a defendant's use of a trademark is likely to confuse. See Beacon Mut., 376 F.3d at 15. That test directs courts to consider:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

Id. Our sister circuits have also developed modified versions of this test specific to false endorsement claims, which often focus on the recognizability of the individual whose identity is being infringed, rather than the strength of the mark. See Fifty-Six

_____

leave it to the district court, with the benefit of adversarial briefing, to rule on any disputes in the first instance on remand.

Hope, 778 F.3d at 1069 (providing a similar eight-factor test in the false endorsement context); Souza, 68 F.4th at 110-13 (explaining that recognizability of the individual "properly calibrates strength" of the mark). But the parties and the district court do not mention any false-endorsement-specific likelihood of confusion test either.

The district court's analysis of confusion instead relied primarily on Pirone. There, the Second Circuit acknowledged that photographs of Babe Ruth could be "symbols" under Section 1125(a), "whether or not a registered trademark is involved." 894 F.2d at 584. It nevertheless concluded that, because those photographs were not used in a way to "indicate origin or represent sponsorship," "[n]o reasonable jury could find likelihood of confusion." Id. at 584-85. The district court treated Pirone as directly on point and was persuaded that appellants' assertion of confusion based on the use of an athlete's photograph must also fail. See Clemente Props., 693 F. Supp. 3d at 246. But even if we, like the district court, found Pirone's analysis to be persuasive, its holding was not as broad as the district court seemed to think. Pirone affirmed summary judgment based on the context of the defendant's use: a calendar that featured many "[p]hotographs of baseball, its players and assorted memorabilia." 894 F.2d at 584. It reached its conclusion that likelihood of confusion could not be established as a matter of law "[i]n the

context of such a compilation" where Babe Ruth was just "one ballplayer among the many featured in the calendar." Id. at 585. This case involves no similar "compilation," but instead just the use of Clemente's name and image in connection with a project whose proceeds were to be collected for "the Roberto Clemente Sports District Fund."

And on a motion to dismiss, we are required to accept the facts pled as true and draw all reasonable inferences in favor of the plaintiffs. Here, appellants say their complaint plausibly alleges actual confusion by the residents of Puerto Rico, who publicly "attack[ed]" appellants based on the mistaken belief that they were receiving money from the commemorative license plates and registration tags. It also plausibly alleges that Clemente, based on his achievements as a baseball player and his humanitarian efforts, was a highly recognizable figure whose name and image appellants had licensed for use in a different license plate program. Allegations like these often tilt the likelihood of confusion balance in favor of plaintiffs, regardless of the exact test used. See, e.g., Beacon Mut., 376 F.3d at 15-19 (laying out and applying the likelihood of confusion test, including emphasis on actual confusion, similarity of goods and services, and strength of mark); Fifty-Six Hope, 778 F.3d at 1069-71 (applying the test for likelihood of confusion in celebrity false endorsement cases and noting as important factors both "high level of recognition of

[the celebrity's] image among Defendants' target market" and association of the mark with apparel and actual confusion). The Commonwealth Defendants respond with a broadside, claiming that appellants "fail to identify any facts in their Amended Complaint that, taken as true, demonstrate a plausible likelihood of confusion." That is plainly contradicted by the allegations we've just summarized. Beyond that, the Commonwealth Defendants marshal no argument for why any of the likelihood of confusion factors work in their favor in this case.

Taking the factual allegations as true, we conclude that likelihood of confusion was adequately pled and thus dismissal of the false association claim could not rest on an absence of likelihood of confusion. We turn then to the district court's final stated basis for dismissing the Section 1125(a)(1)(A) claim.

Conclusory Pleading

The district court's final remark on the Section 1125(a)(1)(A) claim was that the allegations supporting "trademark infringement" were lacking factual detail and merely conclusory. See Clemente Props., 693 F. Supp. 3d at 246. "A conclusory allegation . . . is one which simply asserts a legal conclusion" rather than "a specific factual allegation . . . that merely lacks some surrounding context." Rodríguez-Vives v. P.R. Firefighters Corps., 743 F.3d 278, 286 (1st Cir. 2014) (holding that a complaint was not conclusory where it "described actions of

- 52 -

which [plaintiff] had personal knowledge in sufficient detail to make them plausible").  After reviewing the allegations made in support of appellants' Section 1125(a)(1)(A) claim, we find them to be sufficiently factual and specific.  The complaint alleged a "word, term, name, symbol, or device," 15 U.S.C. § 1125(a) -- Clemente's name and image -- that were used on license plates, registration tags, and in the names of the Sports District and the Fund.  As we just recounted, the complaint also alleged facts showing likelihood of confusion, including actual confusion.  The district court called out one specific element as insufficient: that was the "Plaintiffs' damages allegations," which the district court said state "no more than that [appellants] have been harmed from the alleged violation of the statute." Clemente Props., 693 F. Supp. 3d at 246.  But, as we explained with respect to the Lexmark zone-of-interests analysis, appellants did plead reputational damages caused by the Commonwealth's use of Clemente's name and image that are cognizable under the Lanham Act.  See Beacon Mut., 376 F.3d at 16-17.  And appellants also sought profits that the Commonwealth made from the commemorative license plates and registration tags.  Moreover, the complaint identified the specific surcharges associated with products bearing Clemente's name and image and a public statement by the Commonwealth that it expected to collect $15 million from the

program.  Such damages may be recovered under the Lanham Act.  See 15 U.S.C. § 1117(a).[27]

The district court also faulted appellants for only offering a "formulaic recitation of certain elements" of the cause of action.  Clemente Props., 693 F. Supp. 3d at 246.  While the counts of the complaint did largely consist of quotations of relevant Lanham Act provisions, they also incorporated by reference the factual allegations that had been laid out earlier in the complaint.  See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 233 (1st Cir. 2013) (concluding that a complaint sufficiently put defendants on notice of the claim where a count, though "pled in a muddled fashion, . . . incorporate[d] [relevant] factual allegations by reference"); cf. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) ("We emphasize that the complaint must be read as a whole.").  We thus disagree with the district

---

[27] That statute provides as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a).

court that the allegations of the complaint were too conclusory to state a claim for relief.

Having reviewed all the district court's stated bases for dismissal, we conclude that appellants have adequately pled a claim under Section 1125(a)(1)(A) for false endorsement by use of Clemente's name and image.

**False Advertising, Section 1125(a)(1)(B)**

Our next stop is appellants' cause of action for false advertising under Section 1125(a)(1)(B). The district court thought this cause of action should be dismissed for several reasons we've already rejected (lack of commercial use, lack of Lexmark statutory standing) but also for two independent reasons: (1) a failure to plead "commercial advertising" and "commercial speech" and (2) a failure to plead a false and misleading statement "beyond the use of the mark." Clemente Props., 693 F. Supp. 3d at 245-46.

Appellants' briefs address the latter reason and explain why they believe the district court made the wrong call. They point to allegations in their complaint that accused the government of making false and misleading statements "in the laws, in the license plates and registration labels, in the document of permit for motor vehicles, to the press, and so on," statements that "misled the public to believe that the Clementes endorsed the charges for the trademark in license plates and registration

labels, and the new sports district." But that said, appellants do not make any serious attempt to address the district court's first independent reason for finding the claim insufficiently pled: they never point out facts in their complaint suggesting that the Commonwealth Defendants' statements appeared in commercial advertisements or constituted commercial speech as required for a false advertising claim. While the district court offered little explanation of why it concluded that there was no commercial advertisement, it clearly stated that the element of "commercial speech" was missing. See Clemente Props., 693 F. Supp. 3d at 245-46. Combined with the Commonwealth Defendants' motion to dismiss, that should have given appellants some indication of the issues in dispute, or at the very least, the relevant test to apply.

Yet appellants do not address the test for commercial advertising or promotion in a way that explains why they believe their complaint passes muster. Cf. Podiatrist Ass'n v. La Cruz Azul De P.R., Inc., 332 F.3d 6, 19 (1st Cir. 2003) (providing a four-part test for commercial advertising or promotion).[28] At

_____

[28] Despite binding precedent in the form of Podiatrist Association, appellants insist in a footnote that "there are no legal bases for the supposed requirements" of commercial advertising or promotion and intention to influence potential customers. Based on what was argued below, appellants seem to think that Lexmark overruled any cases regarding commercial advertising or promotion. But the Supreme Court declined to

best, appellants assert that the Commonwealth used "methods that communicate information to the public" and point us towards the classification of certain items in the USPTO Trademark ID Manual as within a class for "[a]dvertising and business." These arguments, if they amount to anything, do little to address the stated basis for the district court's ruling: that the Commonwealth's use of Clemente's name and image don't constitute commercial speech. See Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1115-18 (9th Cir. 2021) (considering whether the defendant's publication constituted commercial speech in a multi-factor analysis of whether the speech "does no more than propose a commercial transaction" (quoting United States v. United Foods, Inc., 533 U.S. 405, 409 (2001))); cf. Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 13 (1st Cir. 2013) (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience" (cleaned up)). We thus deem the matter waived. See Cardona-Martínez v. Rodriguez-Quiñones, 444

---

address that element of a false advertising claim in Lexmark. See 572 U.S. at 123 n.1. At most, it appears Lexmark may have abrogated any requirement that the defendant be a competitor of the plaintiffs. See Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1120 (9th Cir. 2021) (recognizing that Lexmark "likely abrogated" any requirement of competition); Strauss v. Angie's List, Inc., 951 F.3d 1263, 1268 n.5 (10th Cir. 2020) (holding that Lexmark had no impact on the commercial advertising or promotion analysis, but noting that other circuits had "discard[ed]" the competition requirement). Because the argument has not been properly presented to us on appeal, we take no position on Lexmark's impact.

F.3d 25, 29 (1st Cir. 2006); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Accordingly, we affirm the district court's holding that appellants failed to adequately plead statements in commercial advertising or promotion. We note further that, because we affirm dismissal of this claim on the merits, we need not reach sovereign or qualified immunity with respect to the false advertising cause of action.

**Takings Clause Violation**

We turn now to appellants' takings claim. But before we begin our exploration of the issues presented here, it is important to note why we are entertaining a constitutional issue based on a specific takings theory, the viability of which appellants press on appeal but had no opportunity to articulate below. Cf. Sony BMG Music Ent. v. Tenenbaum, 660 F.3d 487, 511 (1st Cir. 2011) (articulating the "long-standing principle of judicial restraint [that] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them" (cleaned up)). Appellants' complaint pled a takings claim, and the Commonwealth Defendants' motion to dismiss never challenged the sufficiency of the pleadings on that front. Rather, they essentially conceded the adequacy of the takings claim, made no arguments against the merits of that claim, and put all their eggs in the immunities basket, which they deemed dispositive in their favor. In its decision granting the motions to dismiss, the

- 58 -

district court sua sponte took up the takings issue and explained why it failed. See Clemente Props., 693 F. Supp. 3d at 246-49. On appeal, all parties have thoroughly briefed the takings claim, and it is properly before us for possible resolution. See Holsum de P.R., Inc. v. ITW Food Equip. Grp., 116 F.4th 59, 66 (1st Cir. 2024) ("Appellate courts may . . . address an issue not presented to the lower court if the lower court nevertheless addressed the issue."). And because, as we're about to explain, we affirm dismissal of the takings claim, addressing the merits of the claim allows us to avoid deciding other constitutional questions posed by the parties' dispute over whether sovereign immunity can be invoked to defeat a takings claim. So without further fanfare, we move on to our discussion.

The Fifth Amendment's Takings Clause "provides that private property shall not 'be taken for public use, without just compensation'" and "is made applicable to the States through the Fourteenth Amendment." Murr v. Wisconsin, 582 U.S. 383, 392 (2017); see also Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d 7, 12 (1st Cir. 2010) (explaining that the Takings Clause applies to Puerto Rico through the Fourteenth Amendment, too). We proceed, as the district court did, by assuming without deciding that appellants have some property interest in their trademark that is cognizable under the Fifth Amendment. See Clemente Props., 693 F. Supp. 3d at 248. We thus

focus our energy on whether the Commonwealth's actions here amounted to a "taking" of said interest.

Appellants insist that the Commonwealth effected a "categorical taking," and so explaining what that means would be helpful. The Fifth Amendment recognizes two distinct types of takings: "physical takings and regulatory takings." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 321 (2002). Physical takings occur "[w]hen the government physically takes possession of an interest in property for some public purpose." Id.; Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002) (en banc) (opinion of Torruella, J.) ("A physical taking occurs either when there is a condemnation or a physical appropriation of property."). In such cases, the government is said to have "a categorical duty to compensate the former owner" and the case can be resolved via "the straightforward application of per se rules." Tahoe-Sierra, 535 U.S. at 322. By contrast, regulatory takings generally involve "ad hoc, factual inquiries" that "allow careful examination and weighing of all the relevant circumstances." Id. (cleaned up); see Me. Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 153 (1st Cir. 2012).[29] But there is

---

[29] The "more nuanced" Penn Central inquiry for non-categorical regulatory takings considers "(1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the

one form of non-physical, regulatory taking that the Supreme Court has described as "categorical" -- "where [the challenged] regulation denies all economically beneficial or productive use" of the plaintiff's property. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992); see Me. Educ. Ass'n, 695 F.3d at 153 (acknowledging the two circumstances where the Supreme Court analyzes takings under a categorical approach).

A straightforward application of these principles, as urged by the Commonwealth Defendants, suggests that the district court correctly determined that appellants failed to plead a plausible categorical taking. Indeed, appellants concede that their "property interests aren't susceptible of 'physical invasion' . . . because they are intangible." Thus appellants cannot establish a categorical physical taking. See Broad v. Sealaska Corp., 85 F.3d 422, 431 (9th Cir. 1996) ("Plaintiffs allege no physical invasion of property, so their claim must fall into the regulatory taking category."); cf. Valancourt Books, LLC v. Garland, 82 F.4th 1222, 1231 (D.C. Cir. 2023) (characterizing a law requiring copyright owners to deposit physical copies of their works with the Library of Congress as a classic physical taking). Nor do appellants challenge the district court's holding

---

government action." Me. Educ. Ass'n, 695 F.3d at 153 (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978)). Appellants do not characterize their claim as a "non-categorical" taking or attempt to address the Penn Central factors.

that the Joint Resolutions and Law 67-2022 do not deprive them of all economically beneficial use.  See Clemente Props., 693 F. Supp. 3d at 249.  That defeats any allegation that this case presents a categorical regulatory taking.

Appellants' argument is that we should nonetheless apply principles from Supreme Court cases regarding physical takings to infringement of trademarks because Puerto Rico has interfered with their right to exclude others from the mark.  In essence, appellants want us to recognize a new form of non-physical taking that is categorical (i.e., doesn't require an ad hoc, factual inquiry) even when the invasion in the property interest may be partial or temporary (as opposed to destructive of all economically beneficial use).  Appellants' argument is that a categorical taking exists because the government appropriated the Clemente mark for itself.  See Cedar Point Nursery v. Hassid, 594 U.S. 139, 148 (2021) (distinguishing between cases in which the government "appropriat[es] private property for itself or a third party" and cases in which it "instead imposes regulations that restrict an owner's ability to use his own property").  This is a relatively novel argument that we have not previously decided and was not considered by the district court.  See Me. Educ. Ass'n, 695 F.3d

at 153 n.5 (declining to reach similar argument).[30] However, "[a]n appellate court is not limited to the legal grounds relied upon by the district court, but may affirm on any independently sufficient grounds." Est. of Soler v. Rodríguez, 63 F.3d 45, 53 (1st Cir. 1995).

We do not think that infringement of intangible intellectual property can be analyzed using the same categorical approach as takings involving the physical possession or occupation of property. Appellants cite cases where temporary and partial physical invasions against an owner's real or personal property were held to be takings. See, e.g., Cedar Point Nursery, 594 U.S. at 152 (concluding that a California law that grants union organizers access to agricultural employers' land is a per se physical taking); Horne v. Dep't of Agric., 576 U.S. 350, 361 (2015) (concluding that a law requiring raisin growers to allocate a portion of their harvest to a government entity is a categorical physical taking); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 421, 438 (1982) (concluding that the installation of

---

[30] In Maine Education Association, we declined to hear a similar argument in the context of state trade secret infringement because it was not properly developed in the district court. See 695 F.3d at 153 n.5. We do not fault appellants for failing to brief this issue in the district court, given that the Commonwealth Defendants did not move to dismiss the takings claim on the merits. See Fid. Co-op. Bank v. Nova Cas. Co., 726 F.3d 31, 39 (1st Cir. 2013) ("The issue is not waived on appeal as it was an issue directly passed on sua sponte by the court below.").

cable equipment, pursuant to a New York law permitting such installation, on appellant's building "constitutes a taking under the traditional test"). Each case emphasizes the unique nature of a property owner's rights over physical property and of any physical possession or intrusion onto such property, which ousts the property owner of their rights in a way that infringement of intangible property does not. See Jim Olive Photography v. Univ. of Houston Sys., 624 S.W.3d 764, 776 (Tex. 2021) (explaining how the "nonrivalrous" nature of copyright undermines any analogy between state copyright infringement and physical takings cases). In Horne and Loretto, the Supreme Court emphasized that the property owner lost all meaningful rights over the portion of property seized. See Horne, 576 U.S. at 361-62 ("Raisin growers subject to the reserve requirement thus lose the entire 'bundle' of property rights in the appropriated raisins -- 'the rights to possess, use and dispose of' them" (quoting Loretto, 458 U.S. at 435)); Loretto, 458 U.S. at 435 (explaining that a "permanent physical occupation of another's property" is "perhaps the most serious form of invasion of an owner's property interests" because the government's occupation "effectively destroys" the owner's entire bundle of rights, including to possess, use, and dispose of it). By contrast, in the context of the Commonwealth's alleged infringement, appellants still own a registered trademark, may use and license others to use their mark, and may sue infringers or

assign the mark within the bounds of trademark law. See Jim Olive Photography, 624 S.W.3d at 776-77.

Appellants argue that Cedar Point provides an inroad because the Supreme Court found a categorical taking while focusing on just one stick in the property bundle of rights: the right to exclude. See 594 U.S. at 149-50. Under the challenged regulation in Cedar Point, union organizers were only allowed on the property for four 30-day periods in each calendar year, and the property owners do not appear to have been prohibited from excluding any other individuals from their property at that time. Id. at 144. Appellants' argument has some first-blush allure because Cedar Point seemingly suggests that a taking happens even if the government regulation in question allows the property owner to make productive use of the property and exclude those not protected by the law. Here, appellants assert that the Commonwealth's use of the Clemente mark was similar to the regulation at issue in Cedar Point because it in some sense "deprived [appellants] of their right to exclude others from the mark." But assuming that this is true, appellants still have not made a compelling case that Cedar Point -- ultimately a case concerned with physical property like Loretto and Horne -- should control here.[31]  See

_____

[31] Characterizing infringement as a deprivation of the right to exclude others from the use of intellectual property is somewhat strained in itself.  One might say that appellants are exercising

Cedar Point, 594 U.S. at 149 ("The essential question . . . is whether the government has physically taken property for itself or someone else -- by whatever means -- or has instead restricted a property owner's ability to use his own property."); id. at 147-48 (recounting the history of physical takings jurisprudence).

Indeed, there is a meaningful difference between small or partial invasions of physical property, as opposed to intangible property.  In the case of physical property, allowing even one individual to temporarily occupy or possess the property physically displaces the owner from possession or control of that portion of the property, however small.  Loretto, 458 U.S. at 438 n.16 ("In any event, these facts are not critical: whether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox.").  Even in Cedar Point, where agricultural employers might still be able to use their land for farming despite the presence of union organizers for limited periods, we think it conceptually meaningful that as long as an organizer was physically present on the property, it meant that the owners could not use or occupy whatever square foot of land that organizer's boots were planted on.  Cedar Point, 594

---

their right to exclude right now, by suing the government for infringement.  By contrast, in Cedar Point, the government regulation created a new legal right of access to the owners' property, such that the owners could not have simply sued the union organizers for trespass.  See 594 U.S. at 162.

U.S. at 149. It's in this context that the Supreme Court adopted an approach that categorically deems the invasion a taking and treats the scope of the invasion as "bear[ing] only on the amount of compensation." Id. at 153. A categorical regulatory taking, which deprives the owner of all economically beneficial use, mimics this aspect of a physical invasion. See Lucas, 505 U.S. at 1017 (suggesting that a categorical rule can be justified because the "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation").

Use of a trademarked word or image does not necessarily have the same effect. See Jim Olive Photography, 624 S.W.3d at 774 (contrasting infringement with physical occupation and possession). Because the property is intangible, the trademark owner's use of the mark remains unimpaired when pressing a straightforward infringement case (though the owner might complain about loss of value, as appellants do here). This, in our view, is good reason not to treat trademark infringement like a physical taking and instead rely on a more measured approach that considers whether there has been a meaningful deprivation of value or loss of rights in a given case.[32] See Murr, 582 U.S. at 395; see also

_____

[32] Even if we adopted something like a categorical approach, we would still need to distinguish between isolated instances of infringement and infringement that prevented the trademark owner from exercising their right to exclude. See Cedar Point, 594 U.S. at 159 (distinguishing "[i]solated physical invasions, not

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987) (explaining that a regulatory takings analysis "requires us to compare the value that has been taken from the property with the value that remains in the property").

There is special reason for caution in the trademark context: a trademark owner's right to exclude is less robust when compared to other forms of property -- and even when compared to other forms of intellectual property. See Bos. Athletic Ass'n v. Sullivan, 867 F.2d 22, 35 (1st Cir. 1989) ("We acknowledge that a trademark, unlike a copyright or patent, is not a 'right in gross' that enables a holder to enjoin all reproductions."); Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 663 (2d Cir. 1979) ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." (quoting United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918))); McCarthy, supra § 2:10 (positing that because the scope of rights in a trademark is defined by "customer perception," "[a]nalogies to other forms of 'property,' from real estate to patents and copyrights, falter"). Thus the "background limitations" on any property

_____

undertaken pursuant to a granted right of access" that "are properly assessed as individual torts rather than appropriations of a property right"); Can. Hockey, L.L.C. v. Texas A&M Univ. Athletic Dep't, No. 20-20503, 2022 WL 445172, at *9 (5th Cir. Feb. 14, 2022) (suggesting that copyright infringement could amount to a taking if continued and repeated).

interest in trademarks might well be exceptions that swallow the rule, or at least require more careful assessment than the more straightforward limitations that apply in the case of physical property. See Cedar Point, 594 U.S. at 160-61 (explaining that "physical invasions" that "are consistent with longstanding background restrictions on property rights," such as common law privileges "to enter property in the event of public or private necessity" or "to effect an arrest or enforce the criminal law under certain circumstances," will not amount to takings); see McCarthy, supra § 2:10.

Appellants point out that the Takings Clause protects intangible property as well as tangible property. We do not quarrel with this point, and we do not hold that trademark infringement never amounts to a taking that requires just compensation. Here, appellants are not just asking us to find that a taking of a trademark can occur. Rather, they ask us to make a conceptual leap that a trademark taking should be governed by the same principles as physical takings. We see no compelling reason to take the plunge in the context of trademark infringement. That appellants have not identified any cases in which invasions of intangible property rights were treated as physical takings implicitly supports preservation of the division between physical and non-physical takings. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984) (analyzing a trade secrets-based claim under

the Penn Central factors); 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1583-84 (Fed. Cir. 1995) (concluding that a landlord did not have per se takings claim where the government did not physically occupy rental office units). But see Armstrong v. United States, 364 U.S. 40, 48 (1960) (concluding that there was a taking of a property interest in liens where the government effected "total destruction . . . of all value of these liens"); Philip Morris, 312 F.3d at 51 (Selya, J., concurring) (disagreeing with lead opinion and positing that trade secrets might be sufficiently analogous to real property to support per se takings analysis).

Because appellants argue no other basis on which their takings claim should proceed, we affirm dismissal of the takings claim against the Commonwealth Defendants and do not reach sovereign or qualified immunity with respect to this claim.[33]

\*

After marching through the arguments regarding appellants' two substantive federal claims against the Commonwealth Defendants, we'll take a quick seventh-inning stretch here and remind the reader of the score.

---

[33] If appellants believe that they stated a takings claim on any other basis (such as a non-categorical regulatory taking), they have not asserted so in their appellate briefs, so we deem any such argument waived. See Zannino, 895 F.2d at 17 (deeming arguments which were not presented "squarely and distinctly" in the parties' briefs waived (cleaned up)).

So far, we've affirmed dismissal of the false advertising claim under Section 1125(a)(1)(B) of the Lanham Act and the takings claim. We conclude, however, that the district court erred in determining that appellants did not state plausible claims under Lanham Act Section 1114 (infringement of registered trademark), Section 1125(a)(1)(A) (false endorsement), and Section 1125(c) (trademark dilution). But before we vacate the district court's holding as to those claims, we must contend with two immunity doctrines that the Commonwealth Defendants argue shield them from liability here.

## Sovereign Immunity

We now consider the Commonwealth Defendants' assertion of sovereign immunity. Broadly speaking, sovereign immunity refers to the inherent power of a government to resist lawsuits initiated against it without its consent. See Alden v. Maine, 527 U.S. 706, 755 (1999). State governments and state officials sued in their official capacity may invoke sovereign immunity against lawsuits seeking money damages.[34] See Lewis, 581 U.S. at 163. As

_____

[34] To avoid confusion, we use the term "sovereign immunity" rather than "Eleventh Amendment immunity" throughout this opinion but pause to note that the two terms usually capture the same concept. The Eleventh Amendment expressly provides immunity to the states in "any suit . . . commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. This would seem not to apply to suits against a state by a resident of that state. Yet it is black-letter law that states have sovereign

this description suggests, sovereign immunity has no bearing on claims made against state officials in their personal or individual capacities, id., or claims seeking prospective injunctive relief against state officials in their official capacities, Greenless v. Almond, 277 F.3d 601, 607 (1st Cir. 2002) (explaining that plaintiffs can "enforce a claim of federal right by obtaining injunctive or declaratory relief against a state officer in the officer's official capacity" (citing Ex parte Young, 209 U.S. 123 (1908))). Appellants try to squeeze their claims through both these escape valves, which we'll elaborate on later. We'll start with whether sovereign immunity protects the Commonwealth and individual defendants in their official capacity against claims for damages.

Puerto Rico, as a self-governing commonwealth, has immunity to suits in federal court equal to that of the states. See, e.g., Miya Water Projects Netherlands B.V. v. Fin. Oversight & Mgmt. Bd. for P.R., 138 F.4th 49, 54 (1st Cir. 2025);

immunity from such suits. The Eleventh Amendment is not a limiting principle but instead "confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact." Virginia Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011) (citing Hans v. Louisiana, 134 U.S. 1, 10 (1890)). As a result, this Court, as well as others (including the Supreme Court), refer to the "Eleventh Amendment immunity" as "convenient shorthand" for the states' immunity from suit, even when the plain text of the Amendment might not apply. Alden, 527 U.S. at 713; see Parente v. Lefebvre, 122 F.4th 457, 461 (1st Cir. 2024) (using the "Eleventh Amendment immunity" shorthand); Maysonet-Robles v. Cabrero, 323 F.3d 43, 46 (1st Cir. 2003) (same).

Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 33 (1st Cir. 2020); Toledo v. Sánchez, 454 F.3d 24, 31 n.1 (1st Cir. 2006). This position is rooted in our precedent, which, as a panel, we may not overrule. United States v. García-Cartagena, 953 F.3d 14, 27 (1st Cir. 2020) (explaining the "law of the circuit" rule).[35] Thus, we do not linger on this point and can move to where the real action is: appellants' arguments that Congress abrogated Puerto Rico's immunity with respect to the Lanham Act. (Because we concluded that the district court correctly determined that the takings claim failed on the merits, we need not address appellants' argument that there is a Takings Clause exception to sovereign immunity either.)

**Abrogation and Waiver Under the Lanham Act**

Sovereign immunity does not automatically smother all cases asserted against the sovereign. We often discuss two ways sovereign immunity may be set aside in a case: waiver (also known as consent) and abrogation. Cf. Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 25 (1st Cir. 2006) (considering a native tribe's sovereignty). Waiver refers to a sovereign's consent to

---

[35] Appellants argue that this precedent is wrongly decided and because Puerto Rico is a territory rather than a state, it lacks sovereign immunity for any claims asserted under federal law or in federal court. Their opening brief states that they seek to "preserve that argument for further review," implicitly acknowledging that their position is contrary to binding circuit precedent.

set aside its own immunity, like when a state legislature enacts legislation allowing the state government to be sued for certain causes of action. See Franchise Tax Bd. of Ca. v. Hyatt, 587 U.S. 230, 238 (2019). Abrogation refers to the act of an outside entity (usually Congress) suspending or limiting such immunity without the sovereign's consent. See Narragansett Indian, 449 F.3d at 25. Regardless of whether "waiver" or "abrogation" is at play, under the clear statement rule, legislation that limits sovereign immunity must be "clear and unequivocal." Id.; see Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc., 598 U.S. 339, 346 (2023) (holding that "Congress . . . must make its intent to abrogate sovereign immunity unmistakably clear in the language of the statute" and explaining that this rule applies "equivalently, in cases naming the federal government, States, and Indian tribes as defendants" (cleaned up)). For waiver, that clear statement is all that is required because "sovereign immunity is 'a personal privilege which [the sovereign entity] may waive at [its] pleasure.'" Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 24 (1st Cir. 2001) (quoting Clark v. Barnard, 108 U.S. 436, 447 (1883)). When Congress intervenes to abrogate a state's sovereign immunity, however, it must not only "express[] its unequivocal intention," but also "act[] pursuant to a valid grant of constitutional authority." Id. at 24 n.9.

Appellants have two arguments, based on the text of the Lanham Act, 15 U.S.C. § 1122 ("Section 1122"), for why sovereign immunity should not apply to the surviving claims against the Commonwealth. On its face, Section 1122(a) involves waiver of federal sovereign immunity, while Section 1122(b) purports to abrogate state sovereign immunity. Our circuit has recognized a "default rule" that "statutes of general application [will] apply equally to Puerto Rico and to the fifty states unless Congress made specific provision for differential treatment." Jusino Mercado v. Puerto Rico, 214 F.3d 34, 42 (1st Cir. 2000) (citing 48 U.S.C. § 734). Because we generally favor treating Puerto Rico like a state for sovereign immunity and statutory interpretation purposes, we start with Section 1122(b), which provides as follows:

> Any State, . . . or any officer or employee of a State . . . acting in his or her official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court . . . for any violation under this chapter.[36]

We do not write on a blank slate here. Section 1122(b)'s formulation is nearly identical to provisions included in the statutes governing patents, 35 U.S.C. § 296(a), and copyrights, 17 U.S.C. § 511(a), which were examined in separate Supreme Court

---

[36] In their briefs, appellants mistakenly cite to "§ 1125(a)," rather than Section 1122(b), as the provision disposing of state sovereign immunity.

decisions.  See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 635 (1999) (patents); Allen v. Cooper, 589 U.S. 248, 253 (2020) (copyrights).  Moreover, Section 1122(b) itself was analyzed in a companion case to Florida Prepaid involving a false advertising claim against an arm of the state of Florida.  See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670-71 (1999).[37] This binding precedent (not to mention the plain language of Section 1122(b) itself) compels the conclusion that Congress expressed an unmistakable intent to abrogate state sovereign immunity for Lanham Act claims.  See Fla. Prepaid, 527 U.S. at 635 (examining similar language under the Patent Remedy Act and concluding that "Congress' intent to abrogate could not have been any clearer"); Allen, 589 U.S. at 255 (holding that an "essentially verbatim provision[]" in the Copyright Remedies Clarification Act was sufficiently clear).  Unfortunately for appellants, that's where their good news ends.  As we've said, for Congress's

---

[37] The careful reader will note that these two Supreme Court companion cases in the same reporter are between College Savings Bank and the Florida Prepaid Postsecondary Education Expense Board.  See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627 (1999); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999).  We draw from both in our discussion, but we'll just note, for reference, that our short cites for each case will consistently draw from the first parties' names in the case titles we just listed.

abrogation to be valid, it must act pursuant to its constitutional authority.

Appellants argue that the relevant constitutional authority in this case is Congress's "enforcement powers under the Fourteenth Amendment," presumably because the infringement of trademarks deprives the trademark owner of property without due process of law.[38]

Before we address that argument, we offer this quick warm-up: Section 5 of the Fourteenth Amendment authorizes Congress to create private remedies against the states and curtails sovereign immunity for violations of the substantive provisions of the Fourteenth Amendment, including the Due Process Clause. U.S. Const. amend. XIV § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."); see Allen, 589 U.S. at 260. Any attempted abrogation under the Fourteenth Amendment must be "tailored to 'remedy or prevent' conduct infringing the Fourteenth Amendment's substantive prohibitions." Id. at 260 (quoting City of Boerne v. Flores, 521

_____

[38] We gather that appellants proceed on the basis of a due process violation from their citation to College Savings, accompanied by their assertion that "the abrogation of States' sovereign immunity regarding the provisions of the Lanham Act dealing with infringement of trademarks, as a protection of property rights under the Fourteenth Amendment, is valid." See Coll. Sav., 527 U.S. at 672 ("Petitioner claims that, with respect to § 43(a) of the Lanham Act, Congress enacted the [Trademark Remedy Clarification Act] to remedy and prevent state deprivations without due process of two species of 'property' rights.").

U.S. 507, 519 (1997)).  In other words, courts look for "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  Id. at 261 (quoting City of Boerne, 521 U.S. at 520).

Assuming without deciding that appellants have a property right of some form in their mark,[39] they have nevertheless failed to establish congruence and proportionality.  To explain, in Florida Prepaid and Allen, the Supreme Court recognized constitutionally cognizable property interests in patents and copyrights, but nevertheless held that Congress's attempts to abrogate sovereign immunity for infringement of such property were not sufficiently tailored to prevent a Fourteenth Amendment violation.  Allen, 589 U.S. at 261, 264-65 ("Copyrights are a form

---

[39] Appellants hang their hat on the following passage from College Savings, which posits that "[t]he Lanham Act may well contain provisions that protect constitutionally cognizable property interests -- notably, its provisions dealing with infringement of trademarks, which are the 'property' of the owner because he can exclude others from using them."  Coll. Sav., 527 U.S. at 673.  This passage is dictum because College Savings concerned abrogation of sovereign immunity only as to false advertising claims under the Lanham Act.  Id.  To resolve abrogation of that claim, the Supreme Court only needed to hold that there is no property right "to be free from" "false advertising" or "to be secure in one's business interests" protected by the Due Process Clause.  Id. at 672-75.  Anyway, because we affirm the district court's dismissal of the false advertising claim on the merits, we need not address sovereign immunity as to false advertising here, and we need not wrestle with the significance (if any) of that dictum.

of property."); Fla. Prepaid, 527 U.S. at 642, 647 ("Patents, however, have long been considered a species of property.").

To reach that conclusion, the Court focused on two aspects of a due process violation. First, the government does not "deprive" anyone of property under the Due Process Clause when acting negligently. Allen, 589 U.S. at 261 (citing Daniels v. Williams, 474 U.S. 327, 328 (1986)); Fla. Prepaid, 527 U.S. at 645 (same). Second, due process exists where state courts offer an adequate remedy for any deprivation of property. See Allen, 589 U.S. at 261-62; Fla. Prepaid, 527 U.S. at 643-44. Allen and Florida Prepaid turned on the absence of any evidence that Congress had attempted to make the abrogation of immunity congruent and proportional with these two limitations on a due process violation. Patent and copyright laws impose liability on infringers who act negligently, but Congress did not limit abrogation of immunity solely to cases where the government engaged in reckless or intentional infringement. Allen, 589 U.S. at 261; Fla. Prepaid, 527 U.S. at 645. Looking to the legislative history of the abrogation provisions found in the patent and copyright laws, the Supreme Court determined that Congress made no inquiry into the frequency with which states intentionally or recklessly infringed patents and copyrights, such as would justify a sweeping abrogation of immunity. Allen, 589 U.S. at 263-65; Fla. Prepaid, 527 U.S. at 644-45. Instead, the legislative history tended to show that

patent and copyright infringement was infrequent and, in many cases, innocent. Allen, 589 U.S. at 264-65; Fla. Prepaid, 527 U.S. at 644-45. Nor did Congress consider the availability of state remedies that would satisfy due process without the need for a federal lawsuit. Allen, 589 U.S. at 265; Fla. Prepaid, 527 U.S. at 644. Because Congress failed to identify any pattern of unconstitutional patent and copyright infringements, the Fourteenth Amendment could not support its attempt to broadly abrogate immunity for all infringement suits. See Allen, 589 U.S. at 265-66; Fla. Prepaid, 527 U.S. at 647.

Despite appellants' protests, there is no principled basis for distinguishing Allen and Florida Prepaid simply because those cases involved patents and copyrights rather than trademarks. As with patents and copyrights, a defendant can be liable for trademark infringement (or dilution) even when acting negligently and thus outside the realm of a due process violation. See Star Fin. Servs., Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 11 (1st Cir. 1996) ("Evidence of bad intent . . . is simply not required in a trademark infringement case."). Indeed, the Lanham Act expressly contemplates innocent infringement. See 15 U.S.C. § 1114(2) (limiting remedies available against certain innocent infringers). And from appellants' admission at oral argument that they "chose" to file in federal court instead of Puerto Rico state court, combined with their assertion of violations of "Puerto Rico

- 80 -

Trademark Law," P.R. Laws tit. 10, §§ 223-223z, we gather that there is likely an adequate state law remedy for trademark infringement (and appellants do not claim there isn't).

The most forceful version of appellants' argument may be that any analysis of the historical record regarding patent and copyright infringement by the states (and Congress's intent to address a pattern of unconstitutional infringement) does not apply here, which concerns a separate statute with its own legislative history. But appellants make no more than a "perfunctory" argument on this front. Zannino, 895 F.2d at 17. Appellants have identified no portion of the legislative record suggesting that Congress passed Section 1122(b) with more attention to tailoring abrogation to a pattern of deprivations of trademark interests without due process of law than it did for nearly identical clauses addressing patent and copyright infringement. Cf. Allen, 589 U.S. at 264 (addressing petitioner's argument that a report commissioned by Congress showed harm to copyright holders if they were not permitted to sue states for infringement). Nor have appellants identified any other cases of trademark infringement by the states or territories. Cf. Fla. Prepaid, 527 U.S. at 640 (noting that Congress identified only two examples of patent infringement suits against the states and that Federal Circuit had only identified eight more). If evidence of such a record exists, appellants have not put it before us and have also made no coherent

argument as to why the congruence and proportionality test is satisfied here.  For all those reasons, the argument is waived for lack of development.  See Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 37 (1st Cir. 2011) ("Parties pursuing appellate review must supply us with enough raw material so that we can do our job."); Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000) ("[D]eveloping a sustained argument out of economic materials and legal precedents is the job of the appellant, not the reviewing court, as we have previously warned.").

But wait.  Appellants claim that we cannot stop our analysis there because Puerto Rico is a territory, not a state, and thus abrogation of its immunity does not raise the same federalism concerns that state sovereign immunity does.  As a result, appellants say, Congress did not need a constitutional hook to abrogate Puerto Rico's immunity; instead, Congress, exercising its plenary power over Puerto Rico, could simply abrogate that immunity.  This is not the first time we've confronted the argument that an unequivocal but seemingly constitutionally invalid attempt by Congress to abrogate the states' immunity nevertheless "suffices to abrogate Puerto Rico's immunity."  Jusino Mercado, 214 F.3d at 39-40 (considering whether the Fair Labor Standards Act abrogates Puerto Rico's sovereign immunity even though Congress could not validly use Article I power to abrogate states' immunity).  We warned in Jusino Mercado that

although there might be "an arguable basis for our treating Puerto Rico differently than the states" in the context of a statutory provision abrogating sovereign immunity, "most legal inquiries that turn upon Puerto Rico's political status are complex." Id. at 40.  Thus, we read statutes to apply equally to the states and to Puerto Rico "unless the language of a particular statute demands [a different] result" or "some other compelling reason" exists. Id. at 42.  A compelling reason is one supported by "specific evidence or clear policy reasons embedded in a particular statute [which] demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." Id. at 42-43 (quoting Cordova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan Bank, 649 F.2d 36, 42 (1st Cir. 1981)).

Here, appellants do not acknowledge Jusino Mercado (which is on point, binding precedent) and do not cite to any portion of the statutory scheme or any compelling policy reason that calls for differential treatment of Puerto Rico.  And for that reason, any argument that Section 1122(b) should be applied differently to Puerto Rico than the states is waived.[40]  See

---

[40] Perhaps it would be possible to construe appellants' arguments regarding Section 1122(a) as an identification of statutory language demanding differential treatment of Puerto Rico.  But such an argument was not squarely made, and, as we're about to explain, we do not think Section 1122(a) is sufficiently

Rodríguez v. Mun. of San Juan, 659 F.3d 168, 176 (1st Cir. 2011) (deeming argument waived where party provided neither "the necessary caselaw nor reasoned analysis to show that he is right about any of this").

This brings us to appellants' argument regarding Section 1122(a), which too fails. Section 1122(a) provides that "[t]he United States, [as well as] all agencies and instrumentalities thereof, . . . shall not be immune from suit . . . for any violation under this chapter." 15 U.S.C. § 1122(a). On its face, this provision says nothing about Puerto Rico, but appellants direct us to the statutory provision explaining how the Lanham Act's definition of the "United States" "includes and embraces all territory which is under its jurisdiction and control." 15 U.S.C. § 1127. The Commonwealth Defendants do not address Section 1122(a) in their response brief, and appellants claim that the Commonwealth Defendants "thus waive[] any rebuttal." Appellants' reply brief stops short of asserting that they should prevail solely based on this waiver. As the rules for this sort of "appellee waiver" have not been directly addressed by our circuit (or briefed by the parties here), we exercise our discretion to consider the merits of this issue.

clear to communicate an intent to restrict Puerto Rico's sovereign immunity. For the same reasons, we do not believe it amounts to a statutory demand to treat Puerto Rico's immunity differently from the states' immunity under Jusino Mercado.

See Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 115 n.20 (1st Cir. 2020) ("bypass[ing] the issue of appellee waiver" and reviewing unrebutted argument de novo where there was "no unfairness" towards appellant (citing W. Va. Coal Workers' Pneumoconiosis Fund v. Bell, 781 F. App'x 214, 226 (4th Cir. 2019))); see also Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 517 (1st Cir. 2009) (addressing unpreserved abstention arguments "in recognition of the important interests underlying the abstention doctrines").[41]  Our approach should not unfairly surprise appellants, as we merely resolve a legal question raised by them by applying the clear statement rule for waiver and abrogation of sovereign immunity, which was cited in the parties' briefs and the district court's opinion.  See Hoolahan, 947 F.3d at 115 n.20; Clemente Props., 693 F. Supp. 3d at 236-37.

The clear statement rule, as we've already said, requires any act of Congress that purports to waive or abrogate

---

[41] We have noted that "[t]he differing roles of appellees and appellants in framing the issues and in presenting arguments justif[y] differing waiver rules."  Ms. S. v. Reg'l Sch. Unit 72, 916 F.3d 41, 49 (1st Cir. 2019); see also W. Va. Coal, 781 F. App'x at 227 (explaining that "respect for the district courts" and the presence of "arguments for affirmance in the form of a reasoned opinion by the lower tribunal" should make appellate courts "more willing to excuse an appellee's forfeiture than an appellant's"). In this case, we are reluctant to give appellants an automatic win given the "jurisdictional" nature of sovereign immunity.  See Larson v. United States, 274 F.3d 643, 648 (1st Cir. 2001) (holding that sovereign immunity can be raised for the first time on appeal and considered by an appellate court sua sponte).

sovereign immunity to be "unmistakably clear in the language of the statute." Fin. Oversight, 598 U.S. at 346 (internal quotation marks omitted). Under this "demanding standard," we cannot conclude that Congress intended to do away with immunity "if there is a plausible interpretation of the statute that preserves sovereign immunity." Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 599 U.S. 382, 388 (2023) (cleaned up). That said, magic words like "sovereign immunity" or "Eleventh Amendment" are not required, and we apply the traditional tools of statutory interpretation in our inquiry. Id.

Under these principles, Section 1122(a), which is titled "Waiver of sovereign immunity by the United States," seems to unequivocally waive the federal government's sovereign immunity over Lanham Act claims. 15 U.S.C § 1122(a) ("The United States . . . shall not be immune from suit . . . for any violation under this chapter."). But we cannot say that Congress unmistakably intended to waive or abrogate Puerto Rico's sovereign immunity based on the definition of the term "United States" that includes "all territory which is under its jurisdiction and control." 15 U.S.C. § 1127. The problem for appellants is that "territory which is under [the United States'] jurisdiction and control" is open to multiple interpretations. Whether the word "territory" captures Puerto Rico is itself ambiguous, given Puerto Rico's status as a self-governing commonwealth. See Cordova &

Simonpietri*,* 649 F.2d at 39-42 (examining the Federal Relations Act's effect in changing Puerto Rico's status "from that of a mere territory to the unique status of Commonwealth" and thus explaining that Puerto Rico was not a "territory" under the Sherman Act); Americana of P.R., Inc. v. Kaplus, 368 F.2d 431, 436 (3d Cir. 1966) (explaining that "Territories" "does not have a fixed and technical meaning that must be accorded to it in all circumstances" and that it may or may not refer to Puerto Rico depending on the context) (citing Puerto Rico v. Shell Co., 302 U.S. 253, 258 (1937))).

Particularly in the Lanham Act, it also seems plausible that Congress used the words "all territory" (singular) to ensure that the statute would cover the entire geographic scope of the United States, rather than refer to the territories (plural) of the United States as political or governmental units. Cf. Lac du Flambeau, 599 U.S. at 388-89 (concluding that the definition of "governmental unit" in a bankruptcy abrogation provision "exudes comprehensiveness from beginning to end" because it includes "a long list of governments that vary in geographic location, size, and nature," including "a Territory," and "concludes with a broad catchall phrase"). A geographical reading would be consistent with provisions of the Lanham Act that govern the importation of goods "into the United States," 15 U.S.C. § 1125(b), and define the fame of a mark based on recognition by "the general consuming public of the United States," 15 U.S.C. § 1125(c)(2)(A). Given

the limited nature of the briefing before us, we do not pretend to definitively construe the meaning of "United States" throughout the Lanham Act.[42]    It is enough to conclude that there is no unequivocal statutory language suggesting that Congress intended to do away with Puerto Rico's sovereign immunity when it passed Section 1122(a).

In our view, one more point seals the deal that Congress was not "unmistakably clear" in its intent to waive Puerto Rico's sovereign immunity via Section 1122(a): as evidenced by our discussion of Section 1122(b), it's not even clear (let alone "unmistakably clear") that Section 1122(a) applies to Puerto Rico at all.  See Fin. Oversight, 598 U.S. at 346.  Like we said, Section 1122(a) focuses on "the United States," while (as we've

---

[42] Section 1122(a) was added in the Trademark Amendments Act of August 5, 1999, Pub. L. No. 106-43, 113 Stat. 218, 219, long after the definition of "United States" in Section 1127 was enacted, Trademark (Lanham) Act of 1946, Pub. L. No. 489, 60 Stat. 427, 443.  The district court emphasized that the legislative history of that act only reflected an intent to subject the federal government to suit, not the states or territories.  Clemente Props., 693 F. Supp. 3d at 237.  Appellants have not challenged the district court's characterization of the legislative history on appeal.  And even if there were some aspect of the legislative history that the district court missed, "[l]egislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment."  Dellmuth v. Muth, 491 U.S. 223, 230 (1989) ("If Congress' intention is 'unmistakably clear in the language of the statute,' recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the [clear statement] rule . . . will not be met.").

discussed) Section 1122(b) focuses separately on "[w]aiver of sovereign immunity by [s]tates."  Compare 15 U.S.C. § 1122(a), with id. § 1122(b).  Recall, earlier, how we explained that "courts will not ordinarily construe statutes to treat Puerto Rico in one way and the states in another unless the language of a particular statute demands that result."  Jusino Mercado, 214 F.3d at 42. For the reasons we've discussed -- namely, the tenuous connection between the United States as expansively defined in 15 U.S.C. § 1127 and Puerto Rico's territorial status -- we think putting Puerto Rico under the coverage of Section 1122(a) can't be reconciled with that principle of statutory interpretation laid out in Jusino Mercado.  Id.  Even if that all might be reconciled somehow, it's not so obvious to us that it's "unmistakably clear," as that case law requires.  Fin. Oversight, 598 U.S. at 346. Instead, we think it's more plausible that Puerto Rico's covered by Section 1122(b).  Yet, for the reasons discussed above, we don't think appellants offered us enough to do the proper analysis for Section 1122(b), so they lost their chance to win the day on this issue.

### Exception for Prospective Relief Under Ex parte Young

Our determination that sovereign immunity applies to Lanham Act claims against the Commonwealth and official-capacity defendants is subject to "a critical exception" recognized by the Supreme Court in Ex parte Young.  Cotto v. Campbell, 126 F.4th

761, 767 (1st Cir. 2025) (citing Ex parte Young, 209 U.S. 123 (1908)). That exception "permits federal courts to issue prospective relief that enjoins state officials from committing future violations of federal law, but not retrospective relief that makes reparation for the past." Id. (cleaned up). The "exception applies if a plaintiff (1) 'alleges an ongoing violation of federal law' by a state official and (2) 'seeks relief properly characterized as prospective.'" Id. at 767-68 (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)).

The district court concluded that there was no ongoing violation of federal law because the sale of license plates and registration tags occurred only during calendar year 2022. See Clemente Props., 693 F. Supp. 3d at 240. Appellants do not dispute this conclusion but assign error to the district court's failure to consider whether they are entitled to "forward-facing relief" against "the unauthorized use of the Roberto Clemente trademark in connection with the Roberto Clemente Sports District." The problem for appellants, however, is that their opposition to the motion to dismiss never articulated an argument specific to the Sports District about the Ex parte Young exception to sovereign immunity, even though the Commonwealth Defendants' motion to dismiss undeniably asserted sovereign immunity as a basis for dismissal. Because appellants did not raise their Ex parte Young arguments

about the Sports District below, we deem the matter waived on appeal. See Reyes-Colón v. United States, 974 F.3d 56, 62 (1st Cir. 2020). Accordingly, we hold that sovereign immunity bars Lanham Act claims against the Commonwealth and the individual officials sued in their official capacities.

## Qualified Immunity

We turn now to the individual defendants' assertion of qualified immunity against the personal capacity claims. See Febus-Rodríguez v. Betancourt-Lebrón, 14 F.3d 87, 91 n.3 (1st Cir. 1994). Under the qualified immunity doctrine, an official is immune to liability for damages when his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam) (quoting White v. Pauly, 580 U.S. 73, 78-79 (2017) (per curiam)); accord Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 83 (1st Cir. 2006). Appellants, however, raise a preliminary issue: whether the Commonwealth Defendants properly invoked qualified immunity below. Appellants correctly assert that the qualified immunity discussion in the Commonwealth Defendants' motion to dismiss argued only that the "requisites of commercial advertising or promotion and intention to influence potential customers are missing from the pleadings." Because "commercial advertising" is only an element of false advertising, appellants justifiably understood the

Commonwealth Defendants to be asserting qualified immunity only as to that cause of action.[43] See Iacobucci v. Boulter, 193 F.3d 14, 22 (1st Cir. 1999) ("[T]he scope of the protection afforded by the doctrine of qualified immunity is claim-specific."); cf. Bennett v. City of Holyoke, 362 F.3d 1, 6 (1st Cir. 2004) ("Raising a defense to a particular claim does not automatically preserve that defense with respect to other independent claims.").

Our circuit disfavors allowing parties to argue, in a reply filing, issues that should have been included in the initial filing because it deprives the non-movant of an opportunity to respond. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015). Those concerns are magnified where, as here, the belated argument is a claim-specific affirmative defense that shifts the burden to come forward with clearly established law onto the opponent. See Iacobucci, 193 F.3d at 22 (explaining that an assertion of qualified immunity as to an excessive force claim on motion for summary judgment "cannot fill [the] void" where the defendant did not assert qualified immunity as to a false arrest claim); see also Est. of Rahim by Rahim v. Doe, 51 F.4th

---

[43] This understanding was all the more reasonable because the only argument the Commonwealth Defendants made regarding the dismissal of any Lanham Act claim on the merits was the failure to allege commercial advertising and promotion as to false advertising. See Podiatrist Ass'n, 332 F.3d at 19 (identifying "intent of influencing potential customers" as an element of commercial advertising and promotion).

402, 410 (1st Cir. 2022) (explaining that the plaintiff bears a "heavy burden" to identify clearly established law (internal quotation marks omitted)).  We do not buy the Commonwealth Defendants' assertion, in the reply memorandum supporting the motion to dismiss below,[44] that they merely declined to "repeat" arguments articulated elsewhere in the motion "in the qualified immunity section."  The Commonwealth Defendants did not make a broad assertion that they were entitled to qualified immunity, which might reasonably be construed to muster arguments made elsewhere in the filing with a "clearly established" gloss.  Instead, they specifically argued that appellants had not established a claim "under the Lanham Act" and identified a particular element of one Lanham Act claim that they believed was missing.  This was not sufficient to meet their burden to invoke qualified immunity.[45]  See Gomez v. Toledo, 446 U.S. 635, 640 (1980).

Arguably, the parties have now had sufficient opportunity to lay out their arguments for and against qualified

---

[44] Commonwealth Defendants do not acknowledge any perceived failure to invoke qualified immunity on appeal.

[45] To illustrate the absurdity of the Commonwealth Defendants' position, we note that their reply supporting the motion to dismiss and their appellate brief assert qualified immunity as to the takings claim.  But the only argument made regarding the takings claim in the initial motion was that it was barred by sovereign immunity.

immunity in their appellate briefs.  But given the Commonwealth

Defendants' failure to properly assert qualified immunity below

and the misleading nature of its assertion, we deem the qualified

immunity defense waived as to any other claim for this appeal.[46]

See Haidak, 933 F.3d at 76 (concluding that qualified immunity was

waived where the defendant failed to invoke it below); Buenrostro

v. Collazo, 973 F.2d 39, 44 (1st Cir. 1992) (declining to consider

qualified immunity on appeal where appellants attempted to "switch

horses" and argue for qualified immunity as to a different theory

of liability than what they argued in district court); see also

Brown v. Crowley, 312 F.3d 782, 788 (6th Cir. 2002) ("By declining

to consider qualified immunity defenses on appeal that were not

---

[46] The partial dissent reads the record differently on waiver
and goes on to say that qualified immunity actually should win the
day for these claims.  Although our sole ground of decision is
waiver, it is also important to recognize how early into the case
we are.  It isn't "always possible to determine before any
discovery has occurred whether a defendant is entitled to qualified
immunity, and courts often evaluate qualified immunity defenses at
the summary judgment stage." Giragosian v. Bettencourt, 614 F.3d
25, 29 (1st Cir. 2010); see also Stringer v. Cnty. of Bucks, 141
F.4th 76, 85 (3d Cir. 2025) ("Rule 12(b)(6) is often a mismatch
for immunity and almost always a bad ground for dismissal.")
(cleaned up).  Ordinarily, qualified immunity is okay this early
only "when the complaint provides all of the facts needed to assess
the plaintiff's claim." Giragosian, 614 F.3d at 29.  The
Clementes' complaint alleges that the Commonwealth Defendants
didn't just reasonably misapprehend the law; they "acted
willfully, intentionally, and fully aware about the mark
appropriation," and did so even after receiving specific notice
from the Clementes about the registration.  Given that we must
take the Clementes' allegations as true at this stage of the case,
we think it premature to decide the qualified immunity issue in
the Commonwealth Defendants' favor now.

raised properly before the district court, moreover, we might encourage future defendants to properly raise this defense at the district court level."). Because we have already concluded that the false advertising claim was not plausibly pled, there is no need to consider qualified immunity on that front. See Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024) (outlining the "two-step inquiry" to evaluate a qualified immunity defense). Thus the surviving claims against the Commonwealth Defendants in their personal capacities under Sections 1114(1), 1125(a)(1)(A), and 1125(c) of the Lanham Act are not subject to qualified immunity at this stage.[47]

## AGAINST THE RELIEVER
## (CLAIMS AGAINST THE AUTHORITY)

Having finally worked through appellants' arguments as to the Commonwealth Defendants, we turn now to the claims against the Authority. The district court explained that it was dismissing

---

[47] Two points are worth clarifying. First, the fact that the Commonwealth Defendants did not properly invoke qualified immunity on a motion to dismiss does not necessarily preclude them from doing so at a later stage of litigation. See Iacobucci, 193 F.3d at 22. Second, we are skeptical of appellants' argument that the Lanham Act abolished qualified immunity. Though we need not reach the issue to resolve this appeal, we note that when legislators have chosen to abolish qualified immunity, they have done so with much greater clarity. See, e.g., Colo. Rev. Stat. § 13-21-131(2)(b) ("Qualified immunity is not a defense to liability pursuant to this section."); N.M. Stat. Ann. § 41-4A-4 ("[N]o public body or person acting on behalf . . . of a public body shall enjoy the defense of qualified immunity for causing the deprivation of any rights, privileges or immunities secured by the bill of rights of the constitution of New Mexico.").

the claims against the Authority for several reasons, including that appellants were simply "parrot[ing] the dispositions of Act 67-2022, which . . . mention the Authority only to designate it as the entity responsible for implementing part of the public policy established in said statute." Clemente Props., 693 F. Supp. 3d at 253. We understand the district court's concern to be that, from the face of the complaint, it is unclear what, if any, actions the Authority (as opposed to the Commonwealth Defendants) took or will take with regard to the Sports District, and thus it cannot determine whether those actions amount (or will amount) to trademark infringement (much less infringement that constitutes a taking). This concern is rooted in the allegations of the complaint, which identify the Authority's statutory responsibilities rather than its actual or anticipated conduct.[48]

Although appellants may have intended their opening brief to address their claims against the Authority and the

---

[48] The district court's reasoning sounds in ripeness, though it did not expressly address this doctrine. "[R]ipeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Reddy v. Foster, 845 F.3d 493, 500, 506 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)) (affirming dismissal on ripeness grounds where there was no plausible allegation of harm "from the statute's mere existence"). Appellants do not argue that the district court failed to conduct a sufficient ripeness inquiry or argue that any dismissal on this basis should have been without prejudice. See id. at 495, 501 (describing two prongs of ripeness and affirming dismissal without prejudice). Thus we do not review the district court's decision from this lens.

Commonwealth Defendants simultaneously, the arguments we've already considered do not answer the district court's concern regarding the actions taken by the Authority. Appellants' only argument specific to the Authority is that the Authority "asked to be" the entity that administered the Sports District[49] and that it will receive income that was generated from the unauthorized sale of license plates. Appellants do not explain how either assertion is relevant to establishing the Authority's liability under the Lanham Act or the Takings Clause. Their reply brief responds to several arguments made by the Authority for dismissal. But to the extent that the reply brief comes closer to addressing the stated basis for dismissal (which we're not sure it does), any arguments for reversal that could have been raised in the opening brief, but were not, are waived. See Sparkle Hill, 788 F.3d at 29 ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."). Because appellants offer no reasoned basis for why their arguments against the Authority were plausibly laid out in their opening brief, we deem such claims waived. See Zannino, 895 F.2d at 17.

## CHECKING THE FINAL SCORE (CONCLUSION)

---

[49] This fact is unsupported by any citation and not alleged in the complaint below.

Having addressed a barrage of overlapping arguments from both appellants and appellees, we pause to check the score. We **affirm** as to the district court's dismissal of all claims against the Authority and of all Lanham Act and Takings Clause claims against the Commonwealth and the individual officials in their official capacities. We also **affirm** dismissal of the false advertising claim, 15 U.S.C. § 1125(a)(1)(B), and the takings claim asserted against the Commonwealth officials in their personal capacities. But we **vacate** the dismissal of claims under 15 U.S.C. §§ 1114(1), 1125(a)(1), and 1125(c) as to the individual Commonwealth officials in their personal capacities. We remand to the district court for further proceedings.[50]

**- Partial Dissenting Opinion Follows -**

---

[50] Appellants did not specifically request reinstatement of their claims under Puerto Rico law, and we express no opinion on the merits of such claims. Appellants are free to ask the district court to exercise supplemental jurisdiction over those claims on remand. See Cloud v. Cmty. Works, 141 F.3d 1149, 1998 WL 85282, at *1 (1st Cir. Feb. 25, 1998) (per curiam) (unpublished table decision).

**Barron, <u>Chief Judge</u>, dissenting in part.** I join the majority's opinion except as to the portion that addresses and then vacates the dismissal of the plaintiffs' Lanham Act claims based on provisions other than § 1125(a)(1)(B) of that statute. In my view, we should simply affirm the dismissal of the claims alleging that the individual Commonwealth Defendants ("Defendants") are personally liable for damages under the Lanham Act.

These claims all depend on what the District Court termed a "commercial use" element. <u>Clemente Props., Inc.</u> v. <u>Pierluisi-Urrutia</u>, 693 F. Supp. 3d 215, 241-43 (D.P.R. 2023). And, unlike the majority, I understand the District Court to have dismissed those claims because it granted the Defendants' qualified immunity as to them on the ground that it was not clear that this element covered the issuance of official license plates. <u>See</u> <u>id.</u> at 252. In that regard, the District Court, after examining that element, stated:

> Governor Pierluisi as well as the other individual Defendants were merely complying with their official duties to enforce a law as adopted by the legislature. As per the caselaw and other applicable law to date, <u>any reasonable public official</u> in their situation could have concluded that no trademark or proprietary rights were being violated by the imposition of the license fees that Plaintiffs have challenged in this case.

Id. (emphasis added); cf. Holsum de P.R., 116 F.4th at 66 ("Appellate courts may . . . address an issue not presented to the lower court if the lower court nevertheless addressed the issue.").

The plaintiffs have not, in my view, explained how the District Court erred in dismissing these claims on the basis of qualified immunity.[51] Although they seek to hold these governmental officials personally liable for carrying out expressly assigned statutory duties, they do not suggest that any precedent of ours clearly established that governmental conduct akin to that involved here satisfies the "commercial use" element. Cf. Guillemard-Ginorio v. Contreras-Gómez, 490 F.3d 31, 40 (1st Cir. 2007) (stating, in the qualified immunity context, that "state officials are ordinarily entitled to rely on presumptively valid state statutes" but that "courts have held such reliance unreasonable where the relevant law is 'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws'" (quoting Michigan v. DeFillippo, 443 U.S.

---

[51] The plaintiffs unpersuasively rely on a statute that addresses sovereign immunity to contend that "the Lanham Act abrogated any qualified immunity that territorial government officials could have had." See 15 U.S.C. § 1122 (providing specifically for the "[w]aiver of sovereign immunity"); cf. Cushing v. Packard, 30 F.4th 27, 47 (1st Cir. 2022) ("[T]he fact that Congress expressly saw fit to abrogate Eleventh Amendment immunity as to actions against states brought under it, but then made no reference to legislative immunity, supports th[e] conclusion" that Congress did not "abrogate legislative immunity 'by covert inclusion.'" (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951))).

31, 38 (1979))). And while out-of-circuit precedent establishes that private parties may violate the Lanham Act when they issue "marquee license plates," Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc., 603 F.3d 1133, 1134-35, 1139 (9th Cir. 2010), it does not speak to the distinct issues that this governmental context raises. Nor are those issues resolved by precedent that provides that, in general, state officials may violate the Lanham Act when they act in their official capacity. See Sofamor Danek Grp., Inc. v. Brown, 124 F.3d 1179, 1185-86 (9th Cir. 1997); cf. Wash. State Republican Party v. Wash. State Grange, 676 F.3d 784, 795 (9th Cir. 2012) (affirming the dismissal of trademark claims against Washington because the plaintiff did not explain "how the state uses the . . . mark in connection with the provision of competing services").

Moreover, the plaintiffs have not identified a "'general' standard," Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 39 (1st Cir. 2024) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)), that "clearly established" that the "commercial use" element covered the governmental conduct at issue here. Accordingly, I see no reason to disturb the District Court's qualified-immunity-based decision to dismiss these claims, see Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021), and so no reason to address any aspect of the question of whether the allegations "make out a violation of a constitutional right,"

Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . .").